In re Leonard SHERVIN t/a Rose Vending Company f/k/a Rose Vending Company, Inc., Debtor.

William FOX, Plaintiff,

v.

Leonard SHERVIN, Rose Vending Company and Rose Vending Company, Inc., Defendants.

Bankruptcy No. 88–12803F.
Adv. No. 88–2315F.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 13, 1990.

Leonard P. Goldberger, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for plaintiff, William Fox.

Paul J. Winterhalter, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for debtor/defendants, Leonard Shervin, Rose Vending Co. and Rose Vending Co., Inc.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

BRUCE I. FOX, Bankruptcy Judge:

Before me for resolution is an adversary proceeding brought by William Fox against the debtor, asserting the nondischargeability in bankruptcy of a debt owed to him. The plaintiff argues that the debt is nondischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(4) and (a)(6). The joint pretrial statement had made reference to § 523(a)(2), but at the hearing on this matter it expressly was agreed that this subsection is not a basis upon which the plaintiff desired to proceed. Thus, the applicability of that subsection is not before me. I also note that the provisions of 11 U.S.C. § 727 involving the grant or denial of a debtor's discharge in bankruptcy are not now before me, although a complaint seeking a determination of nondischargeability under that section is pending and will be tried shortly.

### I.

After hearing the testimony and reviewing the documentary evidence and pleadings, which were also offered in evidence to the extent they contain admissions, I make the following factual findings pursuant to Bankr.R. 7052.

1. The debtor, Leonard Shervin, was the sole shareholder of an entity known as Rose Vending Company, which was incorporated in 1975 and which ultimately liquidated on December 31, 1985. This company was in the business of leasing vending equipment (cigarette, game machines and juke boxes) to bars and taverns in the greater Philadelphia area.

2. The plaintiff is a broker, whose business involved the buying, selling and financing of these sorts of establishments in the same geographical area.

3. At some time in 1975, Fox and Shervin entered into an agreement for their mutual benefit by which Fox would locate and arrange for the placement of Rose Vending Company vending equipment in

such establishments. Shervin was to install, operate and service these machines.

4. A dispute arose in, approximately, November 1985 as to the interest Fox held in Rose Vending and as to the amount of money it owed to him. Fox brought an action in the Court of Common Pleas of Delaware County, Pa., seeking a declaration of his 50% ownership interest in Rose Vending and an accounting for his share of the income, profits and assets of Rose Vending. Shervin contested this claim.

5. Shervin in turn sued Fox and an entity known as Century Vending Co., alleging that Fox and Century had tortuously interfered with contractual relationships that Rose had with various bar owners. Five bars were specifically named in the lawsuit instituted by Shervin.

6. A hearing was scheduled for March 3, 1986, to hear certain preliminary discovery issues in the state court before the Honorable Robert A. Wright.

7. While awaiting hearing in the Delaware County court house on that date, the parties engaged in settlement negotiations regarding the entire dispute. These discussions were mediated, by agreement of the parties, by Joseph Weiss, Esquire, an attorney who at various times had represented both Fox and Shervin individually but who represented neither of them in the lawsuits then pending.[1]

8. Following several hours of negotiations, the parties reached the basic terms of a settlement, to which the parties expressly assented on the record when its terms were stated before Judge Wright.

9. The terms of this agreement included the following components:

(a) Effectuation of the agreement was to occur within 60 days, at which time Shervin and Rose Vending were to pay to Fox the sum of $200,000.00.

(b) Real estate owned by Rose Vending, located in Cornwells Heights, Bucks County, and valued at $100,000.00, was to be transferred to Fox. In connection with this property, Rose Vending agreed to hold and satisfy the outstanding mortgage, and to give Fox or his nominee an indemnification agreement on the mortgage. Rose was allowed to maintain, pursue, and keep any proceeds from a fire insurance claim which might be paid due to fire damage the premises had sustained.

(c) A final amount totaling $200,000.00 was to be paid to Fox or his nominee by paying the sum of $1,000.00 per week for 200 weeks. These payments were to commence during the first week of May, 1986, and were intended to "represent a consulting fee for services rendered to Rose Vending." Ex. D–16 at 25.

(d) Rose Vending further agreed to forgive the indebtedness of Medi–Company Limited, a corporation controlled by Fox.

(e) Fox was to return the equipment and vending "stops" (the servicing of the vending equipment) of certain bars owned by his wife to Rose Vending. Two particular bars were contemplated in this portion of the agreement.

(f) Fox was also obligated to return to Rose Vending "any other deals in which he has given the locations to other vendors." Ex. D–16 at 25. Two other bars were identified for purposes of this provision.

(g) Any disputes arising under the settlement agreement were to be resolved by binding arbitration at an organization such as the American Arbitration Association or Judicate.

(h) The parties agreed to execute mutual releases.

10. Upon hearing the terms of the settlement, the state court judge suggested that a written agreement memorializing the understanding then placed on record be prepared.

11. Prior to the May 9, 1986 closing date, agreements were prepared which were intended to reduce the stipulated settlement to writing. At the time of closing neither party had executed any written agreements (indeed, Shervin was of the position that the settlement agreement did not need any supporting, written agreement).

---

1. Mr. Weiss is not involved in the dispute before me now.

12. The settlement date was continued from May 9 to May 16, 1986, at which time Shervin refused to sign the papers which had been prepared, including a corporate resolution, a deed transferring the real property, a letter agreement characterizing the consulting payments as being for past services, a mutual release, and a "hold harmless" agreement on the mortgage on the real estate being conveyed.

13. Fox then petitioned Judge Wright of the Delaware County Common Pleas Court, who on January 6, 1987, after considering arguments and written memoranda of counsel, determined that the parties had entered into a binding settlement agreement, and entered an order directing that any dispute with regard to the terms of the settlement must be resolved by binding arbitration.

14. The parties proceeded to have their disputes heard before Judicate, a private arbitration organization. Following hearings on several dates before Judicate Arbitrator D. Donald Jamieson, an opinion and an order were entered on November 7, 1987.

15. The Judicate opinion held, *inter alia*, that Shervin and Fox had entered into a legally binding settlement agreement on March 3, 1986, that Fox had maliciously interfered with certain of the leases in dispute, that the parties were to conduct a closing in accordance with the ruling within 30 days of that ruling, and that at the closing Shervin and Rose Vending would be entitled to an adjustment of the amount they owed to Fox in accordance with the Judicate opinion.

16. The opinion also stated that should closing not occur within the time set, a further hearing would be scheduled to determine damages in accordance with the opinion.

17. The closing directed by the Judicate arbitrator did not occur. Therefore, a subsequent hearing was held before Arbitrator Jamieson on February 12, 1988. On March 8, 1988 Jamieson entered a Supplemental Opinion awarding to Fox the sum of $345,-296.00, with interest.

18. The Supplemental Opinion specifically noted that Fox and Shervin had not entered into any security agreements, and that the arbitrator would not enter, therefore, an order to the effect that Fox either had, or had a right to, a valid and enforceable security interest by way of a financing statement and security agreement in the assets of Rose Vending.

19. The decision of the arbitrator was reduced to judgment in the Court of Common Pleas for Delaware County by order dated May 19, 1988, and recorded against Shervin and Rose Vending on May 26, 1988.

20. By agreement dated May 20, 1987, Shervin sold the music and cigarette portion of Rose Vending to Route Management Systems, Inc. in consideration for $204,520.00, of which $41,606.00 was paid in cash and $162,914.00 was for the assumption of certain liabilities.

21. By agreement dated April 17, 1987, Shervin sold the real estate located in Cornwells Heights, Bucks County at 2040 State Road to Operator Service and Supply, Inc. for $105,697.00.

22. By agreement dated May 20, 1987, Shervin sold the video game portion of Rose Vending to his son-in-law, Charles Davis, for the consideration of $50,976.00, of which $31,000.00 was paid in cash and $19,976.00 was for the assumption of a debt.

23. Shervin transferred to his wife in March 1987 his entireties interest in their house in Broomall, Pennsylvania for no consideration, although he continued to reside there.

24. Shervin transferred to his wife the title to two automobiles, for no consideration, at approximately the same time he transferred his interest in the house. Shervin continued to use these automobiles.

25. Shervin transferred, in 1986, his interest in a $60,000.00 certificate of deposit to his wife, which certificate had been held jointly by those parties.

26. Shervin had been in possession of the stock of an entity known as 60's Long Lounge, Inc., the assets of which included

real estate, which he transferred for no consideration to his son-in-law, Charles Davis. This transfer took place subsequent to March 3, 1986, and before May, 1988, but on an undisclosed date. Mr. Davis ultimately sold the corporation's real estate for $25,000.00.

27. Shervin filed his instant petition in bankruptcy under chapter 11 in August 1988.

## II.

Based upon the foregoing factual findings, I reach the following legal conclusions.

1. A legally binding settlement had been reached by the parties in the Delaware County Court of Common Pleas on March 3, 1986.

2. A debt arose by virtue of that settlement, owing from Shervin to Fox.

3. Shervin stood in a fiduciary relationship to Fox by virtue of his status as an officer and director of Rose Vending, because under Pennsylvania law corporate officers and directors stand in a fiduciary relationship to corporate creditors.

4. Fox failed to establish that the debt held by Fox against Shervin arose from Shervin's breach of this fiduciary relationship. Therefore, this debt is not made nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

5. Fox failed to establish that the debtor either embezzled funds or committed larceny, so as to render the debt owed to him nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

6. Fox failed to establish that the debt owed to him is nondischargeable by virtue of 11 U.S.C. § 523(a)(6).

## III.

The first issue to be addressed is my ability to hear this debt dischargeability complaint, raised in a chapter 11 bankruptcy prior to the time that the plan is confirmed. This issue arises due to the Third Circuit Court of Appeals decision of *In re Johnson–Allen*, 871 F.2d 421 (3d Cir.), *cert. granted sub nom Pennsylvania Dept. of Public Welfare v. Davenport*, — U.S. ——, 110 S.Ct. 49, 107 L.Ed.2d 18 (1989), which held that in chapter 13 cases, a question of dischargeability should not be decided until after plan payments are made, because until that point one would not know what the dischargeability issues will be, and a decision prior to that time would in effect be an advisory opinion. This question was directed to the parties prior to the beginning of the trial, and argument was heard on the question. Both parties took the position that the reasoning of *Johnson–Allen* should not be applied in a chapter 11 bankruptcy, and I agree.

Bankruptcy Rule 4007(c) requires nondischargeability complaints in chapters 7 and 11 to be brought within 60 days of the first date set for the meeting of creditors held pursuant to 11 U.S.C. § 341(a). *See, e.g., In re Rhodes*, 61 B.R. 626 (9th Cir.B.A.P. 1986); *In re Kirsch*, 65 B.R. 297 (Bankr.N.D.Ill.1986); *In re Maher*, 51 B.R. 848 (Bankr.N.D.Iowa 1985). *See generally In re Kearney*, 105 B.R. 260 (Bankr.E.D.Pa. 1989). This rule must be compared with Bankr.R. 4007(d), under which no time limit is imposed for the filing of complaints under § 523(c) in chapter 13 cases. If plan payments are not completed and a hardship discharge under 11 U.S.C. § 1328(b) is sought, the court must then fix the time for filing dischargeability complaints in chapter 13 bankruptcy cases under Bankr.R. 4007(d).

In a chapter 13 case, neither the debtor nor the creditors will be in a position to adequately address the issues of debt dischargeability until it is known whether the debtor has been able to complete the payments under the confirmed plan as described in 11 U.S.C. § 1328(a) or whether the debtor seeks a "hardship discharge" under § 1328(b). As an order of discharge granted pursuant to § 1328(a) covers all debts (excepting alimony, maintenance and support obligations, and certain long-term obligations specially provided for under the plan), all of the other grounds for the exception of discharge of debt provided by § 523, while applicable under chapters 7 and 11, have no application in a chapter 13

plan unless the debtor has failed to complete all of the payments under the plan. *See, e.g., Matter of Gregory,* 705 F.2d 1118 (9th Cir.1983).

By way of contrast, 11 U.S.C. § 1141(d)(2) provides that the confirmation of a chapter 11 plan of reorganization does not discharge an individual debtor from any debt excepted from discharge under § 523. Moreover, in chapter 11 the discharge occurs when an order of confirmation is entered, *see, e.g., Woodson v. Robintech, Inc.,* 69 B.R. 77 (E.D.La.1986); *In re Modern Tables, Inc.,* 26 B.R. 585 (Bankr.N. D.Ala.1983), while in chapter 13 the discharge does not occur until the plan has been completed (or a hardship discharge is entered). *See, e.g., In re Johnson–Allen; In re Heincy,* 858 F.2d 548 (9th Cir.1988); *In re Johnson,* 787 F.2d 1179 (7th Cir. 1986). Thus, it appears that under chapter 11 the issues of debt dischargeability must be decided prior to plan confirmation, for confirmation acts as an order of discharge. The bankruptcy rules reflect this notion in requiring that debt dischargeability complaints be brought relatively early in a chapter 11 bankruptcy case.

Also, I note that Bankr.R. 4004(a) sets the time for filing a complaint which objects to a debtor's discharge in bankruptcy under § 727(a) in a chapter 11 case "not later than the first date set for the hearing on confirmation." Under § 1141(d)(3), the issues involving a § 727 denial of discharge will not arise until the time of confirmation of the chapter 11 plan. As Bankr.R. 4007 is not similarly limited, the rules must contemplate that the dischargeability of a debt would be decided prior to the confirmation process.

Therefore, I agree with the parties and conclude that the result of *Johnson–Allen* is limited to chapter 13 cases, where plan compliance will affect the discharge the debtor can obtain, and does not apply to chapter 11 cases where debt dischargeability issues must be decided prior to the confirmation process.

## IV.

The issues before me involve only the determination of debtor nondischargeabili-

ty pursuant to 11 U.S.C. § 523(a)(4) and (a)(6). As Judicate has previously determined that there was a settlement between these parties, the parties do not now assert that I must revisit that question. Instead, the debt owed to Fox, ultimately found to be in the amount of $345,296.00 (plus interest accruing at the legal rate), which was reduced to judgment in the state court, is to be examined for nondischargeability only on the grounds now asserted by the plaintiff. I shall address each of the two asserted statutory bases *seriatim.*

## A.

■ 11 U.S.C. § 523(a)(4) provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

This section governs fraud or defalcation while acting in a fiduciary capacity, and embezzlement or larceny while not acting in a fiduciary capacity. *In re Salamone,* 78 B.R. 74, 76 (Bankr.E.D.Pa.1987). This provision of the Bankruptcy Code, and the others that also deal with debt dischargeability, are to be construed liberally in favor of the debtor and applied strictly against the creditor, so as to effectuate the "fresh start" policy concern of bankruptcy. *In re Belfry,* 862 F.2d 661 (8th Cir.1988); *In re Kalra,* 95 B.R. 28 (Bankr.E.D.Pa. 1989); *In re Borbidge,* 90 B.R. 728, 734 (Bankr.E.D.Pa.1988).

■ The existence of a fiduciary relationship must be proven by evidence that is clear, precise and unambiguous. *In re James,* 94 B.R. 350, 352 (Bankr.E.D.Pa. 1988); *In re Borbidge,* 90 B.R. at 733. This fiduciary relationship is a prerequisite to a determination of nondischargeability for fraud or defalcation under section 523(a)(4). *In re Napoli,* 82 B.R. 378, 381 (Bankr.E.D.Pa.1988). The qualification that the debtor be acting in a fiduciary capacity is limited to express or technical

trusts, and cannot be extended to trusts *ex maleficio,* which may be imposed because of the very act of wrongdoing out of which the contested debt arose. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Thornton,* 544 F.2d 1005 (9th Cir.1976). As noted by a leading commentator, "the common place frauds of the ordinary debtor in disposing of his property so as to hinder, delay, or defraud his creditors" do not fall within § 523(a)(4). *See* 3 *Collier on Bankruptcy* ¶ 523.14 at 523–98 (15th ed.1989). Thus, in order for § 523(a)(4) to disqualify a debt from discharge, the fiduciary relationship must have existed prior to or independent of the particular transaction from which the debt arose, and the debt must be due from the fiduciary acting in that capacity. *See, e.g., Davis v. Aetna Acceptance Co.; In re Black,* 787 F.2d 503 (10th Cir.1986); *In re Stefanoff,* 97 B.R. 607, 609 (Bankr.N.D.Okla.1989); *In re Lane,* 76 B.R. 1016, 1022 (Bankr.E.D.Pa.1987); *Matter of Falk of Bethlehem,* 3 B.R. 266, 273 (Bankr.D.N.J.1980). *Accord Matter of Moreno,* 892 F.2d 417, 421 (5th Cir.1990).

The plaintiff argues that Shervin was acting in a fiduciary capacity due to two factors. First, Fox contends that Shervin stood in a fiduciary relationship to him by virtue of Shervin's status as an officer and director of Rose Vending, because, pursuant to applicable Pennsylvania law, a corporate officer or director stands in such a relationship to shareholders and creditors. Second, the plaintiff posits that an express trust was imposed upon Shervin, which under Pennsylvania law was created by the settlement agreement.[2]

 Under the first theory, Shervin unquestionably served as an officer and director of Rose Vending. *See, e.g.,* Exs. D–2, D–3, D–5. Thus, Shervin stood in a fiduciary relationship to Rose Vending and

to the stockholders of that corporation. *Higgins v. Shenango Pottery Co.,* 256 F.2d 504, 507 (3d Cir.1958); *In re Complete Drywall Contracting, Inc.,* 11 B.R. 697, 699 (Bankr.E.D.Pa.1981); *Robar Development Corp. v. Minutello,* 268 Pa.Super. 406, 408 A.2d 851 (1979). *See* 42 Pa.C.S.A. § 8363. However, the evidence did not show that Fox was a shareholder of that company, to whom a fiduciary relationship was owed. On the contrary, all the evidence of record established that Shervin was the sole shareholder of Rose Vending.[3] Exhibit D–4 is book containing the certificates of stock of Rose Vending which could be used to establish ownership in that stock. The book contains 25 such possible certificates; only certificates number 1 and 2 had ever been issued. The first granted to Leonard Shervin 10 shares of that company on March 20, 1975. The second certificate apparently issued to Benjamin Shervin a total of 10 shares in Rose Vending on March 20, 1976, although a note stapled over this entry states that this certificate was "cancelled" on April 20, 1976. This second certificate is not contained within Ex. D–4. Shervin testified that he attempted to interest his brother Benjamin in becoming partners with him, and, therefore, gave him certificate number 2. Benjamin Shervin rejected this offer of partnership, and the debtor therefore directed his attorney to cancel that stock issuance.

Fox testified, on the other hand, to his belief that he held 100 shares of stock in Rose Vending. He stated that these were issued on one certificate, and were issued to Benjamin Shervin in trust for himself. The plaintiff stated that the trust agreement had been reduced to writing, and had been signed by Benjamin Shervin. Fox did not, however, produce either that trust agreement or the certificate purporting to grant Benjamin Shervin 100 shares of Rose Vending. Also, Benjamin Shervin testified

---

**2.** It is the plaintiff's burden to establish the existence of an express trust. *E.g., In re Borbidge,* 90 B.R. at 734. This express trust must be proven by evidence which is "clear, precise and unambiguous." *Id.; In re Estate of Trbovich,* 488 Pa. 583, 413 A.2d 379, 380 (1980), *quoting In re Kerwin's Estate,* 371 Pa. 147, 89 A.2d 332 (1952).

**3.** Plaintiff contends in his posttrial submission that the statement of uncontested facts in the joint pretrial statement, #3, declares that the plaintiff was a shareholder of Rose Vending. Upon review, the stipulated facts make no such admission.

to the effect that he had never been a shareholder of that company, and that he never was a trustee or a trustee under a voting trust agreement for Fox, and had never seen a document purporting to create such an agreement. Based upon the record, and upon the credibility of the various witnesses, I conclude that Fox was not a shareholder of Rose Vending.[4]

■ I reach this conclusion in spite of the language found in the Judicate opinion, that "Fox and Shervin entered into a joint venture in which each was to own fifty (50%) percent of the stock of Rose. Fox's stock was held for him in the name of Shervin's brother Benjamin." Opinion, at 2. The plaintiff asserts that I am collaterally estopped to hold that he is a shareholder of Rose Vending by virtue of this language in Judicate's prepetition ruling.

As noted by numerous courts, collateral estoppel (or issue preclusion, see *Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir.1988)) embodies the principle that later courts should honor the first decision of a matter that had been actually litigated. *E.g., Rider v. Pennsylvania*, 850 F.2d 982, 989 (3d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 556, 102 L.Ed.2d 582 (1988). In order to preclude this debtor from relitigating an issue related to dischargeability, a four part test has been established. As enumerated by the Third Circuit, this test requires that:

> ... (1) The issue sought to be precluded must be the same as that involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by valid and final judgment; and (4) the determination must have been essential to the prior judgment.

*Matter of Ross*, 602 F.2d 604, 608–09 (3d Cir.1979). *Accord, e.g., Laganella v. Braen*, 900 F.2d 621 (3d Cir.1990); *In re*

*Graham*, 94 B.R. 386, 389 (Bankr.E.D.Pa. 1988). In determining whether this test has been met, the bankruptcy court must carefully review the record made in the court issuing the prior judgment. *Matter of Ross*, 602 F.2d at 608; *In re Cobley*, 89 B.R. 446, 448 (Bankr.E.D.Pa.1988).

I conclude that the second element of this four part test has not been met; that is, I do not find that the issue of whether Fox was a shareholder of Rose Vending was actually litigated in the Judicate proceedings. Instead, it appears clear from the opinion that the sole issues before the arbitrator involved the terms of the settlement agreement and the respective rights or duties created by that agreement. I see no evidence that the issue of shareholder status was "actually litigated" before Judicate. On the contrary, this issue appears immaterial to Judicate's analysis and conclusions. In the absence of any evidence that this issue was actually litigated in the prior proceeding, *In re Cobley*, and as I read the arbitrator's language regarding this issue as dictum, I easily conclude that issue preclusion does not apply in the instant proceedings. Therefore, there was no fiduciary relationship between Shervin as corporate officer and director and Fox as shareholder.

### B.

The fiduciary relationship created by Shervin's corporate officer status might otherwise extend to Fox if it were established that Fox was a creditor of Rose Vending, a fiduciary duty accordingly was owed to Fox, and that during the course of the fiduciary relationship a breach in that duty occurred, which occasioned the debt that the plaintiff now seeks to discharge. That is, as I noted above, subsection (a)(4) may disqualify a debt from discharge only where the fiduciary relationship (here, Shervin as corporate officer and Fox as

---

4. Counsel for plaintiff requested, after the close of the defendant's case in chief and after plaintiff had called Fox on rebuttal, that I keep the record open to a later date for the purpose of allowing the plaintiff to produce the voting trust agreement, and to allow debtor's counsel the opportunity to cross-examine the plaintiff as to

that document. I sustained the objection to this request on the basis that the document was not disclosed in the joint pretrial statement, and that given the posture of the parties there could have been no surprise as to that which Benjamin Shervin (a witness listed on that statement) was going to testify.

corporate creditor) existed previous to or independent from the transaction from which the debt arose; the debt must be due from the fiduciary in his or her capacity as fiduciary. *Davis v. Aetna Acceptance Co.; In re Lane; In re Criswell,* 52 B.R. 184, 201 (Bankr.E.D.Va.1985). *See* 3 *Collier on Bankruptcy* at 523–101. Here, under the principles governing the Bankruptcy Code it may well be posited that Fox was a creditor of the corporation prior to March 1986, but Fox suggests that his status as creditor was earned solely by virtue of his alleged shareholder status. Indeed, Fox had initiated the state court proceedings in order to assert rights as a shareholder. To the extent that I have determined that Fox was never a shareholder of Rose Vending, he cannot claim creditor status by virtue of stock ownership.

■ To the extent the plaintiff is arguing that he was owed a duty of care by Shervin as fiduciary on a basis other than his shareholder status, i.e., that Fox had performed work from which Shervin had benefitted and for which Fox should be remunerated, and which duty was later breached by Shervin, I still must conclude that under § 523(a)(4) the debt is not non-dischargeable. Again, this section envisions that the fiduciary relationship must have existed prior to or independent of the transaction from which the debt arose. *Davis v. Aetna Acceptance Co.; Matter of Moreno.* If I assume that an unliquidated debt arose by virtue of Fox's efforts in a mutual enterprise with Shervin, then I also have to acknowledge that that is the "transaction" by which the fiduciary relationship was created. The debt and the fiduciary duty having thereby arisen simultaneously, there can be no finding of non-dischargeability under this subsection.

The plaintiff's argument must be that Shervin owed to him a fiduciary duty prior to the March 1986 settlement (by virtue of the debt owed to Fox for services performed), and that this duty was breached by Shervin's entering into a settlement

agreement that he never intended to fulfill. However, as the plaintiff must establish the existence of this prior fiduciary relationship by "clear, precise and unambiguous evidence," I cannot find that this burden was met. The plaintiff did not present evidence to establish that such a debt was created in the manner just posited. On the contrary, Fox had previously asserted only shareholder status. He also did not present evidence to establish that Shervin had no intention of complying with the settlement when the agreement was reached. Given the absence of evidence on these crucial points, I must conclude that this basis argued by the plaintiff must be rejected.

### C.

■ The plaintiff next argues, however, that an express trust was created by the March 1986 settlement, and that by virtue of this trust a fiduciary relationship owing to Fox from Shervin arose. *See In re Napoli,* 82 B.R. at 381–382 (discussing fact that the common law may impose an express or technical trust upon partners, and discussing relevant New Jersey state law). I disagree that an express trust came into existence by virtue of the settlement.

■ Here, the settlement agreement is not designated as a "trust;" this fact does not, however, preclude the finding that a trust arrangement was made. *In re Evans' Estate,* 372 Pa. 284, 93 A.2d 683 (1953); *Buchanan v. Century Federal Sav. & Loan Assoc.,* 374 Pa.Super. 1, 542 A.2d 117 (1988), *app. denied,* 520 Pa. 612, 554 A.2d 505 (1989). Instead, the parties' intent to create a trust may be gleaned from other objective manifestations of intent. *E.g., In re Penn Central Transp. Co.,* 486 F.2d 519 (3d Cir.1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974); *In re Professional Air Traffic Controllers Organ.,* 26 B.R. 337 (Bankr.D.C.C.1982), *aff'd,* 724 F.2d 205 (D.C.Cir.1984).[5] This objective conduct must show, by evidence that is clear and

---

**5.** Conversely, the presence of words that denominate an agreement as a "trust" is not sufficient to establish an express trust. *Upshur v. Briscoe,*

138 U.S. 365, 375, 11 S.Ct. 313, 316, 34 L.Ed. 931 (1891); *In re Penn Central Transp. Co.*

unambiguous, the intent to create an express trust. *Presbytery of Beaver–Butler v. Middlesex Presbyterian Church*, 507 Pa. 255, 489 A.2d 1317, *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985).

Under Pennsylvania law,[6] in order to create an express trust there must be a res, an intent to create a trust, and a beneficiary. *Sherwin v. Oil City Nat'l Bank*, 229 F.2d 835 (3d Cir.1956); *In re Johnston.* A trust must be distinguished from a debt, which arises when one incurs merely an obligation to pay a certain sum of money. A trust, on the other hand, exists where one takes on a duty to deal as a fiduciary with specific property for the benefit of another. *In re Penn–Dixie Steel Corp.*, 6 B.R. 817, 823–24 (Bankr.S.D. N.Y.1980), *aff'd*, 10 B.R. 878 (S.D.N.Y. 1981). Obviously, if a creditor-debtor relationship but not a fiduciary relationship exists between the parties, there can exist no express trust. *Accord Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980); *Matter of Dloogoff*, 600 F.2d 166 (8th Cir.1979); *In re Cairone.*

At times, whether a debt or a trust arose may not be clear. *In re Penn–Dixie Steel Corp.*, 6 B.R. at 823. In general, it is understood that when the "trustee" of the funds is entitled to use them as his or her own and commingle them with his or her own money, a debtor-creditor relationship exists, not a trust. *In re Penn Central Transp. Co.;* 4 *Collier on Bankruptcy* ¶ 541.13 at 541–77 (15th ed.1990).

I conclude, for related reasons, that the settlement agreement did not create an express trust with respect to the amount of money Shervin thereby owed Fox. Shervin was not required to segregate these funds, thereby creating a res. In Pennsylvania, "a trust without a res is impossible." *Bair v. Snyder County State Bank*, 314 Pa. 85, 171 A. 274 (1934). *Compare DiLucia v. Clemens*, 373 Pa.Super. 466, 541 A.2d 765, *app. denied*, 520 Pa. 605, 607, 553 A.2d 968 (1988) (where a "Declaration of Trust" named someone to hold a specific number of shares of stock in trust for another, and the trustee conceded an intent to create this trust, the fact that the shares were not segregated will not defeat the trust). It is inconsistent with the concept of a trust that the "trustee" may use the "trust funds" in any manner, and may draw upon them for various expenses, without an obligation to segregate the funds. *Upshur v. Briscoe; In re Pehkonen*, 15 B.R. 577 (Bankr.N.D.Iowa 1981). Here, there is no indication that there was an identified res of money, put apart and held separately and for the benefit of another. Shervin was allowed to pay the sums due, on the date they were owed, from whatever source he chose. Shervin may have had to sell personal assets to procure this cash; he might have had to convert certain securities to obtain the money, or perhaps borrow the sums; he may even have had these sums on deposit in a bank at the time the agreement was reached. Absent evidence to indicate that Shervin held his own funds in trust for Fox,[7] I cannot conclude that there was an express trust created.

Similarly I cannot conclude that Shervin held specific property—the Cornwells Heights real estate—in an express trust for Fox. Instead, it appears that this portion of the settlement agreement may at best resemble (or be analogized to) an agreement of sale for real property. I view the parties as perhaps being in a vendor and purchaser relationship, but not in one of trustee and beneficiary. Certainly, a contract for purchase and sale of land is specifically enforceable, and the purchaser is held to acquire an equitable interest in

---

6. Relevant state law determines the existence of an express trust. *E.g., In re Borbidge*, 90 B.R. at 734; *In re Professional Air Traffic Controllers Organ.; In re Johnston*, 24 B.R. 685 (Bankr.W.D. Pa.1982); *In re Cairone*, 12 B.R. 60, 62 n. 4 (Bankr.D.R.I.1981).

7. Of course, the fact that there was no transfer of property into a trust by a settlor does not bespeak a failure of a trust, where Shervin must be presumed to be both settlor and trustee. Where there is a declaration of trust and the declarant already owns the property, no transfer of title to a trustee is needed. Instead, the declarant ceases to own the property for his or her own benefit, but instead holds it strictly for the benefit of another. *DiLucia v. Clemens;* 2 *Scott on Trusts* § 100, at 817.

the land prior to conveyance. Thus, it has been said that the vendor, prior to the conveyance, is trustee for the purchaser. 1 *Scott on Trusts* § 13 (1967; 1986 & 1988 Supp.). However, if utilizing the terminology of the law of trusts, "it is more accurate to speak of the relation as constituting a constructive trust than it is to call it an express trust." *Id.*, at 141. Of course, section 523(a)(4) speaks only to express, not constructive, trusts.

I do not see that Shervin took on any fiduciary relationship with respect to Fox by agreeing to transfer to him this property. It appears that Shervin could have sold his interest in the real estate subject to the "contract" with Fox; a trustee, on the other hand, cannot properly transfer this property to another person subject to the trust, since the trustee in his or her fiduciary relationship may not delegate duties. 1 *Scott on Trusts* § 13.

Therefore, for all the above reasons I conclude that the existence of the requisite fiduciary relationship has not been established, for the purposes of § 523(a)(4).[8]

### D.

Section 523(a)(4) also prohibits discharge of debts of embezzlement or larceny. Embezzlement is defined as "[t]he fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, as with the consent of the owner...." *Moore v. United States*, 160 U.S. 268, 269–70, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895). *See also In re Salamone*, 78 B.R. 74, 77 (Bankr.E.D.Pa.1987); *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr.S.D.N.Y.1985); *In re Barwick*, 24 B.R. 703, 706 (Bankr.E.D.Va. 1982).

An embezzlement (and a larceny) need not have occurred while the debtor was acting in a fiduciary capacity for the purposes of § 523(a)(4). *In re Cobley*. Embezzlement and larceny must be proven by evidence that is clear and convincing. *Matter of Weber*, 892 F.2d 534, 438 (7th Cir.1989); *In re Epperson*, 45 B.R. 708, 711 (Bankr.E.D.Tenn.1985). Here, they were not. As the debtor was the original owner of the disputed property, no misappropriation could ever have occurred. *In re Phillips*, 882 F.2d 302, 304 (8th Cir.1989). The plaintiff failed to show that he entrusted property to Shervin at any time, or that Shervin, legally or otherwise, was possessed of property owned by Fox. Absent this element, neither embezzlement nor larceny can be demonstrated.

### V.

The other basis upon which the plaintiff relies, § 523(a)(6), states that a discharge in bankruptcy "does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of

---

**8.** The debtor does not argue, but I note, that the settlement agreement arguably could have extinguished the underlying action for fraud, and limited any future relief to the enforcement of the settlement agreement itself. However, the courts to have considered this argument have, I believe correctly, rejected this analysis. Strong public policy forbids debtor from discharging a debt incurred through fraud while acting in a fiduciary capacity and a debt so created is not to be discharged in bankruptcy. *Greenberg v. Schools*, 711 F.2d 152, 156 (11th Cir.1983) ("underlying debt was unquestionably the result of the debtor's fraud, not his breach of the settlement agreement. The fact that appellant's claim never matured into a final judgment but was terminated by a settlement agreement should not be controlling"); *In re Pavelka*, 79 B.R. 228, 232 (Bankr.E.D.Pa.1987) (Twardowski, J.) (on motion for summary judgment, notes that settlement of a lawsuit, which purported to release debtor from future liability, "cannot give debtors unfettered power to erase their non-dischargeable debts through a well-timed settlement agreement," *citing Greenberg* ). *Accord, e.g., In re Bobofchak*, 101 B.R. 465 (Bankr.E.D. Va.1989) (court should examine underlying nature of debtor's original obligation notwithstanding the settlement agreement); *In re Rush*, 33 B.R. 97 (Bankr.D.Me.1983) (deciding whether debt nondischargeable under § 523(a)(2)(A)). *But see In re Kelley*, 259 F.Supp. 297 (N.D.Cal. 1965), *aff'd*, 372 F.2d 94 (9th Cir.1967) (if a note is given in satisfaction of the underlying claim, it will be considered a novation and is dischargeable in bankruptcy); *In re Anderson*, 64 B.R. 331 (Bankr.N.D.Ill.1986) (debtor failed to meet burden by clear and convincing evidence that the note he signed was a novation).

another entity." The terms "willful and malicious" refer to the intentional doing of an act which necessarily produces injury. *In re Cobley,* 89 B.R. at 452. As stated by the Ninth Circuit Court of Appeals, "the paradigmatic case for § 523(a)(6) ... seems to arise when a debtor intentionally injures a creditor and the creditor seeks to make nondischargeable a judgment that he has won in a state court tort action." *In re Rubin,* 875 F.2d 755, 758 n. 1 (9th Cir. 1989). Under this subsection, the willful and malicious injury must be proven, in most instances, by a preponderance of the evidence. *Laganella v. Braen.*

Also, for the debt to be nondischargeable as one for willful and malicious injury, that debt "must stem from the wrongful act that is without excuse." *In re Akridge,* 71 B.R. 151, 153 (Bankr.S.D.Cal.1987), *aff'd,* 89 B.R. 66 (9th Cir.B.A.P.1988). *See also Matter of Cullen,* 71 B.R. 274, 278 (Bankr. W.D.Wis.1987) (creditor must establish, *inter alia,* that the injury it suffered "gave rise to a claim for damages" in its favor). In the instant case, then, it must be shown that the debt owing to Fox, determined to be in the amount of $345,000.00, is based upon, or occasioned by, a willful and malicious injury. *See In re Hampel,* 110 B.R. 88 (Bankr.M.D.Ga.1990) (employer's failure to obtain mandatory workmen's compensation insurance does not render debt due employee from injury nondischargeable, since lack of insurance did not cause injury).

■ Here, the plaintiff argues that Shervin had Rose Vending pledge specific property to Fox under the March 1986 settlement agreement, which property he then sold and the proceeds he then frittered,

scheming to deprive Fox of payment. Plaintiff's memorandum of law, at 17–18. I cannot conclude that this dissipation of assets, in the current factual setting, results in the nondischargeability of the debt under 11 U.S.C. § 523(a)(6).[9] Certainly the evidence does show that Shervin embarked upon a plan to dispose of his assets in order to make himself judgment proof against Fox.[10] However, the evidence fails to reveal that Shervin's debt to Fox is based on an injury to or wrongful act against Fox or his property; that is, I cannot conclude from the record that the actions upon which the original settlement was created had to do with wrongful conduct on the part of the debtor against Fox.

To the extent the plaintiff may be arguing that subsection (a)(6) applies in this instance by virtue of the debtor's tortious and wrongful conversion of property, I cannot agree. Certainly, this statutory provision is understood to include common law conversion that is done willfully and maliciously. 3 *Collier on Bankruptcy* at 523–122. *See, e.g., In re Singleton,* 37 B.R. 787 (Bankr.D.Nev.1984). The Third Circuit Court of Appeals has defined conversion as

> an act of willful interference with the dominion or control over a chattel, done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession.... A person not in lawful possession of a chattel may commit conversion by intentionally dispossessing the lawful possessor of the chattel....

*Baram v. Farugia,* 606 F.2d 42, 43 (3d Cir.1979), *citing Norriton East Realty Corp. v. Central–Penn Nat'l Bank,* 435

---

**9.** The plaintiff also asserts that the debtor received consideration from the sales of certain vending "stops" to Davis and Aronovitz, which were not expressly mentioned in the various agreements of sale, Exs. P–4, P–5, and that the debtor thereby deliberately attempted to hide his assets from Fox. Due to the extreme distrust between the parties, the lists of "stops" purchased by Davis and Aronovitz from Shervin were filed under confidential seal with this court. I have compared these lists with the one provided by Fox of known Shervin stops transferred to these third parties, and indeed find that some stops were apparently transferred

from Shervin to these parties, which sales were not otherwise disclosed. However, for purposes of my analysis under § 523, I find that this finding is not relevant.

**10.** While a debtor's inability to account for funds may result in the denial of discharge under § 727, *see In re Gallini,* 96 B.R. 491 (Bankr.M.D.Pa.1989) (discharge denied where loss of assets due largely to a newly acquired gambling habit not adequately explained), as I have noted above that section currently is not now at issue.

Pa. 57, 60–61, 254 A.2d 637, 638–39 (1969); *Baker v. Rangos*, 229 Pa.Super. 333, 348, 324 A.2d 498, 505 (1974). *Accord In re Behr*, 42 B.R. 922, 925 (Bankr.E.D.Pa.1984) ("conversion is any unauthorized act which deprives an owner of his property permanently or for an indefinite time").

Thus, the threshold question for the plaintiff is whether he had any property over which Shervin asserted wrongful dominion. *In re Shah*, 96 B.R. 290, 293 (Bankr.C.D.Cal.1989). This question must be answered in the negative. Fox produced no evidence of a security agreement or interest in the property which Shervin admittedly sold to Davis and Aronovitz. In fact, the Judicate supplemental opinion specifically discussed the lack of a security agreement between the parties. Judicate apparently was asked by Fox to enter an order "to the effect that as of May 6, 1986 [the original closing date on the real estate, as set by the March, 1986 agreement] he either had or had a right to a valid and enforceable security interest by way of a financing statement and security agreement in the assets of Rose." Ex. P–2 at 5. Judicate noted that in the absence of such a provision in the settlement stipulation, it had no authority to impose this obligation on the parties, citing *Century Inn, Inc. v. Century Inn Realty, Inc.*, 358 Pa.Super. 53, 516 A.2d 765 (1986).

In sum, on or before March 6, 1986, Shervin became indebted to Fox; this debt, however, did not arise from willful and malicious conduct, nor did it arise from Shervin's defalcation or fraud while in a fiduciary capacity. It arose, as debts often do, because parties differ as to their legal responsibilities. Shervin's conduct after the debt was liquidated, if improper, can be addressed by virtue of 11 U.S.C. § 727(a). That is the true nature of Fox's complaint and that issue will be before me shortly.

### ORDER

AND NOW, this 13th day of April, 1990, upon consideration and for the reasons set forth in the accompanying Opinion, the plaintiff's request that I declare a debt nondischargeable pursuant to 11 U.S.C. § 523(a)(4) and (a)(6) is **DENIED.**