**In re William DAWLEY, Debtor.**

**Estate of Stanford Harris, Plaintiff,**

v.

**William Dawley, Defendant.**

**Bankruptcy No. 01–32215DWS.**
**Adversary No. 01–1148.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 16, 2004.

---

4. Presumably, the USDA authority to promulgate such a regulation resides in 5 U.S.C. § 301.

---

James P. Golden, Esquire, Jane B. Laporte, Esquire, Hamburg & Golden, P.C., Philadelphia, PA, for Plaintiff.

Gary P. Lightman, Esquire, Lightman, Manochi & Christensen, Philadelphia, PA, for Defendant.

Dave P. Adams, Esquire, Office of the U.S. Trustee, Philadelphia, PA, United States Trustee.

## MEMORANDUM OPINION

DIANE WEISS SIGMUND, Chief Judge.

Before the Court is the Complaint of the Estate of Stanford Harris (the "Plaintiff") seeking an Order denying the discharge of the debtor William Dawley ("Defendant" or "Dawley") pursuant to 11 U.S.C. § 727(a)(2)and (a)(4) and alternatively seeking an exception from discharge of the Defendant's debt to the Plaintiff pursuant to 11 U.S.C. § 523(a)(4). A trial was held on January 14 and 16, 2004 after which briefs were to be filed by the parties. The briefing schedule having concluded,[1] this matter is ripe for decision. For the reasons that follow, judgment is entered for the Plaintiff.

## BACKGROUND

The following facts are either stipulated in the Amended Joint Pretrial Statement (the "Statement of Uncontested Facts") or were established at trial.

On November 25, 1998 Stanford Harris ("Harris") commenced an action (the "State Court Action") in the Court of Common Pleas of Philadelphia County ("State Court") against Defendant William Dawley and Payphone, Inc., an entity in which Defendant was an officer and the operating shareholder. The State Court Action alleged breach of fiduciary duty, conversion and breach of contract in connection with shareholder distributions from Payphone to which Plaintiff claimed to be entitled and for which he was not paid. Statement of Uncontested Facts ¶ 1; Exhibit P–1. On February 2, 2000, following a nonjury trial, a judgment was entered in favor of Plaintiff and against Defendant and Payphone, jointly and severally, in the amount of $180,000 (the "Judgment"). Statement of Uncontested Facts ¶ 5; Exhibit P–1.[2] On September 5, 2000, Judge Patricia A. McInerney who presided over the trial released an eleven page Opinion in support of the Judgment.[3]

---

1. On February 9, 2004, Plaintiff filed the Estate of Stanford Harris's Memorandum of Law Supporting Complaint Objecting to Discharge ("Plaintiffs Post–Trial Memorandum"). According to the briefing schedule, Defendant's response was due February 27, 2004. However, no brief was filed.

2. The Judgment became final on June 9, 2000 after Defendant's post-trial motion was denied. Statement of Uncontested Facts ¶ 6.

3. The Opinion was apparently necessitated by Defendant's appeal of the Judgment to the Superior Court. The Judgment was affirmed on April 19, 2001, and reargument was denied. Statement of Uncontested Facts ¶ 11.

On the basis of the Opinion, I find that Defendant was a shareholder along with Plaintiff and three other individuals[4] in Payphone which "earned its income by contracting with restaurants and taverns and the like in the Philadelphia area to provide 'video poker' amusement machines in the establishment." Opinion at 1–2. According to the shareholders' agreement, Payphone's profits were distributed in accordance with the shareholders' percentage of ownership. "This agreement was essentially followed through the first half of 1998." *Id.* at 2. In December 1997, Defendant stated that he would not provide Plaintiff with any more distributions from Payphone because it had lost many of its customers and there would be no money to pay him from then on. *Id.* at 4. Prior to Payphone commencing its operations, Franbern, a corporation owned by Plaintiff and Greenstein, had been in the same line of business. When Payphone began operating, Defendant and Greenstein ceased doing business through Franbern. However, "[o]n July 1, 1998, Mr. Dawley converted the Payphone accounts to Franbern accounts" and began operating them as Franbern accounts. *Id.* at 5. As a result, Payphone had no income and Plaintiff received no distribution on account of his interest while Franbern was very profitable. *Id.* The Judgment in the

amount of $180,000 represents approximately three years of the share of Payphone's profits that Plaintiff would have received but for the Defendant's "unlawful conversion." *Id.* at 11.

On August 29, 2001, two months after Defendant had exhausted his state court remedies with respect to the Judgment and prior to the recovery by Plaintiff of any payment thereon, Defendant filed the instant Chapter 7 case.[5] Christine Schubert, Esquire (the "Trustee") was appointed the interim and then became the permanent Chapter 7 trustee. Consistent with her duties as trustee, a meeting of creditors was conducted on September 9, 2001 at which time Defendant was examined under oath.[6] The basis of the examination was Defendant's Schedules and Statement of Affairs filed under penalty of perjury pursuant to the Bankruptcy Code and Federal Rules of Bankruptcy Procedure. Exhibit P–46A. According to those Schedules, Plaintiff is Defendant's sole priority or non-priority unsecured creditor. *Id.*[7]

The Schedules filed by Defendant with his bankruptcy petition omitted certain assets that the Defendant acknowledges he owned. Specifically, he failed to disclose a parcel of real estate in New Jersey, cash in a safe and the existence of three bank accounts.[8] However, at the meeting the

---

The Opinion has been stipulated as evidence by the parties.

4. The shareholders were Harris (21.99%), Dawley (16.67%), Bernard Greenstein ("Greenstein") (16.67%), Harvey Fischer (deceased) (29.99%) and Gerald Fischer (14.67%).

5. On August 13, 2001, Plaintiff filed an action to avoid fraudulent transfers in the Court of Common Pleas of Philadelphia County which was stayed by the bankruptcy case. 11 U.S.C. § 362. Statement of Uncontested Facts ¶ 17. The Trustee subsequently commenced a similar action in this Court. Christine C. Schu-

bert v. William and Judith Dawley, Adv. No. 02–0332.

6. The § 341 meeting was never formally concluded although the Trustee appears to have considered it so.

7. The only other claim listed is the unquantified joint secured claim of Ford Motor Credit on account of a 2000 Explorer which Defendant has reaffirmed and is paying currently at $400 per month. *Id.*

8. There was also testimony about the failure to disclose a loan or gift to Mrs. Dawley's sister. *See* note 24 *infra.*

Defendant provided the Trustee with an amendment to his Schedules that disclosed one of those assets, *i.e.*, his interest in the real estate, 25% undivided interest as tenant in common in nine parcels of New Jersey marshland suitable for duck hunting and valued at zero for which he paid $13,000.[9] At the meeting Defendant acknowledged that a $31,048.37 payment (the "Undisclosed Cash") had been tendered to him and his wife Judith Dawley ("Judith") on July 15, 2001 and deposited in her individual bank account at Mellon Bank. Uncontested Fact ¶ 12. The sum represented funds due to him from Elgee–Saver, Inc. t/a Penn Telephone Systems ("Elgee–Savar") as the final installment in a sale to it of the assets of Coin Call, Inc., a corporation in which Defendant held a 50% interest with Greenstein. On questioning as to the whereabouts of the monies, Defendant stated that all the funds had been exhausted for living expenses. His Schedules had identified $200 in cash and as noted, no bank accounts. Exhibit P–46(A). In truth the undisclosed cash had been withdrawn from Judith's Mellon account and placed by her in a safe in the Dawley's attic. It was only after the Trustee brought a motion for temporary restraining order and Defendant and Judith were compelled to turn over those funds[10] that the existence of remaining cash in the amount of $9,950 was disclosed. Thereafter on April 18, 2002 an amendment to Schedule B was filed listing cash of $9,550[11] and bank accounts in Fox Chase Federal Savings, T/E ($5.73), Summit/Fleet Bank, T/E ($4,000) and Mellon ($4,525.66). Docket No. 19; Exhibit 46(D).

In addition to his interest in Coin Call, Defendant had also owned with Greenstein 50% of the shares of Franbern, an interest that was sold to Greenstein on June 28, 2000. Statement of Uncontested Facts ¶ 9. At the time the petition was filed, Defendant no longer held an interest in either entity. Greenstein and Defendant were business associates for 15 years. Greenstein testified that he bought out Defendant's interest in Franbern because Defendant was an alcoholic and conditions were unbearable. Notwithstanding that fact, Greenstein continues to employ Defendant as a Franbern salesman and indeed increased his compensation after the partnership was severed. While treating these payments as salary, the compensation was fixed without regard to Defendant's duties or performance. Rather Greenstein explained that Judith informed him that Defendant's Franbern compensation was insufficient to live on and he increased it accordingly.

Defendant represented to the Trustee at the § 341 meeting that the interests in Coin Call and Franbern were owned by husband and wife, not him individually. The Coin Call tax return, Exhibit P–4, contradicts that representation as does the stream of payments in 1999 and 2000 made solely to Defendant. Defendant's Statement of Affairs ¶ 2 discloses payments on account of the sale of his interests in Franbern and Coin Call to *him and Judith* in 1999, 2000 and 2001. Exhibit 46(A). Actually the checks were initially made to Coin Call and endorsed by Defendant, Exhibit P7, then made payable to William Dawley, Exhibit P–9, and from June 15, 2000 to July 10, 2001, made payable to

---

9. That amendment was filed on November 1, 2001. Doc. No. 11. It did not address the cash or the bank accounts.

10. A temporary restraining order was entered on March 14, 2002 in Adv. No. 02–332.

11. This represented the remaining cash paid to the Trustee from the $31,048.37 proceeds of Defendant's interest in Coin Call subsequently transferred to Judith..

William and Judith Dawley. Exhibit P–10 and 11.

The latter changes in payee were made at the request of Greenstein. Greenstein testified that he asked Elgee–Savar to make its payments to Defendant and Judith without any prompting by Defendant out of concern that Defendant, who is an alcoholic, would not bring the money home. Moreover, he stated that it was Elgee–Savar that negotiated to pay the balance of the purchase obligation in a discounted lump sum in August 2001 rather than continue installment payments of the full amount, thus generating the $31,048.37 payment. Greenstein contended that Mike Savar ("Savar"), Elgee–Savar's principal, had sought the early pay off because the business was not doing well and because he did not want to get involved in the Harris–Dawley litigation. Greenstein also attributed his practice of making his checks for the Franbern stock payable to Defendant and Judith, to Defendant's alcoholism and the desire to ensure that Judith would get the money.

The parties presented Savar's deposition testimony which contradicted the representation by Greenstein regarding the stimulus for the early lump sum payout of the Coin Call purchase price. He stated that in early July 2001 Greenstein requested the early payout which Savar agreed to as a reciprocation of an earlier agreement by Greenstein to reduce the monthly payments and extend the original installment period. Moreover he testified that he had no knowledge of the State Court Action.

Judith testified that she first learned that Coin Call was sold when she received the $31,048.37 check from Greenstein. She was not asked what she believed the monthly installment payments deposited in the couple's joint bank account represented.[12] She initially deposited the check into the parties' joint Fleet bank account but then moved it on August 19, 2001 to her Mellon individual account, Exhibit P–12. She claimed that she believed the amount to be $3,100, and when it was pointed out by the teller that it was $31,000, she wanted to prevent Defendant from having access to it so she subsequently moved it to her individual account. Finally she withdrew it from that account in four separate transactions: July 27 ($15,000), July 30 ($5,000), August 8 ($5,000), August 8 ($5,000) due to her expectation that Plaintiff's execution on its judgment would freeze her account. The funds were then placed in a home safe located in the attic.[13]

According to Judith and Defendant, there are safes in both the attic and the basement, the existence of which were never revealed to Defendant's original attorney Marvin Gold, Esquire ("Gold") who then did not disclose them on the Schedules or reveal them to the Trustee. When asked why the safes were not disclosed, Defendant stated that his attorney did not ask him specifically about the existence of any safes. The money was placed in the attic safe by Judith, and Defendant claims no knowledge of that fact. He had testified at the § 341 meeting about a safe, identifying it as containing guns and the

12. Judith took over the management of the joint banking accounts 2–1/2 years ago due to Defendant's drinking impairment. Prior to that, Defendant took care of the accounts and she paid the bills. She stated that she never discussed business with him.

13. While her trial testimony was inconsistent as to her motive for withdrawing the funds (i.e., fear of execution or fear of dissipation by her husband), her deposition testimony was clear that the execution proceedings prompted her actions. Moreover, the funds were protected from William when she deposited them in her individual account so there was no need to move them further.

deed to the New Jersey property but no cash. This, he now contends, was the basement safe, not the attic safe of which he claims no knowledge, and thus contends his testimony regarding its contents was accurate.

Defendant was represented in the State Court Action by Gold who recommended the filing of bankruptcy after the Judgment became final. Gold also represented Greenstein and was responsible for the preparation of the asset purchase agreement by which Coin Call was sold to Elgee–Savar. Gold also handled the transaction by which Defendant sold his interest in Franbern to Greenstein. Gold testified about the disclosures made on the Schedules and to the Trustee. Taking responsibility for the omissions, he stated that Defendant informed him about the bank accounts and the New Jersey swampland but he believed no disclosure was necessary since the former assets were owned as tenants by entireties and the latter had no value. Gold stated his belief, albeit erroneous, that marital assets were not assets of the estate and acknowledged that his understanding of the law colored his inquiry of the Defendant so questions regarding joint assets were not pursued.[14] When he learned otherwise, he stated he promptly amended the Schedules. He could not explain why in light of that explanation he listed a number of other assets (*e.g.*, real estate as "t/e/") as joint property on the original Schedules. With regard to the cash, he stated that it was disclosed to him by Judith.[15] He acknowl-

edged never having inquired about any safes and only learned of the existence of a safe at the TRO hearing. He stressed that all disclosure decisions were made by him and that Defendant's involvement, including in the decision to file bankruptcy, was impaired by his alcoholism. Indeed he noted that on all prior occasions, including the § 341 meeting of creditors,[16] Defendant had been intoxicated. The Trustee testified that she had no recollection of Defendant's sobriety being in question when he was examined at the § 341 hearing.

## DISCUSSION

Given that Plaintiff's debt is the only obligation sought to be discharged in this bankruptcy, the Complaint's assertion of an objection to dischargeability under § 523, if sustained, has the same effect as refusing to discharge the Defendant under § 727. As such, I will address the three statutory bases that Plaintiff advances for contending that the Judgment should survive this bankruptcy case.

I. Objection to Dischargeability
 Pursuant to § 523(a)(4)

 Under § 523(a)(4), an individual may not obtain discharge for any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For discharge to be denied under this provision, Plaintiff must prove that Defendant either (1) committed a fraud or defalcation while acting in a fiduciary capacity or (2) committed embezzlement or larceny while acting in any capacity. *Fox v. Sher-*

---

14. Gold, a general practitioner, stated that his bankruptcy experience was limited to the three or four Chapter 7 cases filed over the past 20 years.

15. When he asked Defendant about the existence of cash, Defendant said "do you mean in my pocket" to which Gold replied affirmatively. The response was $200. While Gold stated his belief that Defendant was unaware

of the cash, I find that testimony without any foundation and so speculations as to be lacking probative value.

16. Gold stated that Defendant, fine as the day began, would become more uncontrollable as the day progressed. He speculated that he was secretly drinking during breaks. He stated that Defendant was inebriated during the State Court Action as well.

vin (In re Shervin), 112 B.R. 724, 730 (Bankr.E.D.Pa.1990). As the party objecting to discharge, Plaintiff must prove the elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 288–89, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991).[17] Plaintiff asserts that the underlying debt represented by the Judgment was based on both defalcation while acting in a fiduciary capacity and embezzlement. It relies on the findings of the State Court as set forth in Judge McInerney's Opinion to which the Defendant concedes it is bound by principles of collateral estoppel, to establish the elements of both causes of action and ultimately meet its burden under § 523(a)(4).[18]

With respect to a judgment entered by the state court, the principles of collateral estoppel of the state where the judgment was entered, *i.e.*, Pennsylvania, should be applied, *Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315 (6th Cir.1997) *citing Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985) (*quoting Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 1898, 72 L.Ed.2d 262 (1982)) (Full Faith and Credit Statute, 28 U.S.C. § 1738, directs a federal court to refer to the preclusion law of the state in which the judgment was rendered). Under Pennsylvania law on issue preclusion (*i.e.*, collateral estoppel), a party may be precluded from relitigating an issue only if: "(1) the issue decided in prior adjudication was identical with issue in later action; (2) there was final judgment on merits; (3) party against whom plea is asserted was

party or in privity with party to prior adjudication; and (4) party against whom plea is asserted has had full and fair opportunity to litigate issue in question in prior action." *Schulman v. J.P. Morgan Investment Management, Inc.*, 35 F.3d 799, 806 (3d Cir.1994) (*quoting* Pennsylvania authority). Defendant, although conceding elements (2),(3) and (4), disagrees that the issues decided in the State Court Action are the same issues as would support liability under § 523(a)(4).

I thus turn first to the Complaint that gave rise to the State Court Opinion to identify the issues that were decided *vis a vis* the issues presented herein. Four counts were stated: breach of contract (Count I), breach of fiduciary duty (Count II), conversion (Count III) and demand for an accounting. The State Court Opinion found Defendant liable on each count, and presented detailed factual findings in support of the legal conclusion that Defendant had breached his fiduciary duty to Plaintiff and converted the assets of Payphone to his own benefit. Notably there was no count for fraud or embezzlement and not surprisingly Judge McInerney did not mention either term. Defendant contends that Judge McInerney's failure to find fraud or embezzlement forecloses the application of collateral estoppel of her findings to this case. On the other hand, Plaintiff sets forth the facts that were found in support of the Judgment and argues that they will likewise support liability under § 523(a)(4) for fraud while acting in a fiduciary capacity and/or embezzlement. Obviously the parties have

---

**17.** When the standard of proof is the preponderance of the evidence, "the plaintiffs burden is to convince [the factfinder] upon all the evidence before [it] that the facts asserted by the plaintiff are more probably true than false." *Applebaum v. Henderson (In re Henderson)*, 134 B.R. 147, 156 (Bankr.E.D.Pa.1991)(*quoting Burch v. Reading Co.*, 240 F.2d 574, 579 (3d Cir.1957)).

**18.** Plaintiff relied solely on the Opinion and did not present any evidence on this claim.

very different views on the application of the doctrine of collateral estoppel.

This precise issue was addressed by this Court in *KV Pharmaceutical Co. v. Harland (In re Harland)*, 235 B.R. 769 (Bankr.E.D.Pa.1999). In that case the plaintiff contended that a state court judgment arising from an action in contract and fraud was non-dischargeable under § 523(a)(4) and (6) because it arose from fraudulent conduct which was manifested in wilful and malicious injury to plaintiff perpetrated by the debtor. In response, relying on a "technical assessment of the State Court's Judgment and orders, as compared to the specific language of §§ 523(a)(4) and (6)," the defendant argued that there was no direct match of issues since the state court had neither used the exact phrase "willful and malicious injury" nor did it award damages for "fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." *Id.* at 772–73. Rejecting that narrow view, the Court reviewed the record and concluded that it did not support a finding of willful and malicious injury under § 523(a)(6) because the Court did not discuss the issue as an element of either breach of contract or fraud but rather addressed it only in the context of punitive damages. Nor did it support a finding of fraud under § 523(a)(4) since the state court's determination of tortious fraud did not equate with fraud committed while acting in a fiduciary capacity as required by that dischargeability provision. With respect to non-dischargeability under § 523(a)(4) for embezzlement, a different result obtained. The Court stated:

> However, in reviewing the record, we find numerous references to factual findings which could support the conclusion that the Plaintiff engaged in embezzlement, *despite the confinement of the claims in the underlying Judgment to counts for breach of contract and fraud.*

The Court explained in *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), that collateral estoppel may bar relitigation of any issues previously tried before a state court in a nondischargeability complaint as long as that state court resolved factual issues using standard identical to those of the bankruptcy court's exception to discharge under § 523.

*Id.* at 776–77 (emphasis added). Setting forth the dispositive factual findings, the *Harland* Court concluded that "the State Court had articulated conclusions of law which provided a basis on which to determine whether they comported with the standards for embezzlement under which we may find an exception to discharge pursuant to 523(a)(4)." *See also Berkery v. Commissioner, Internal Revenue (In re Berkery)*, 192 B.R. 835, 838–39 (E.D.Pa. 1996) (in connection with a dischargeability complaint under § 523(a)(1)(C), bankruptcy court was correct in applying collateral estoppel to findings of the Tax Court regarding the existence of additional income, the source thereof and the income tax deficiencies since all the elements required for collateral estoppel were met with respect to those issues).

█ I agree with this analytical framework for application of collateral estoppel in this case and reject the Defendant's position that the failure of Judge McInerney to find Plaintiff liable for fraud or embezzlement forecloses my doing so if her findings support the elements of fraud while acting in a fiduciary capacity or embezzlement as construed under § 523(a)(4).

### A. *Defalcation While Acting in a Fiduciary Capacity*

█ The first ground relied upon by Plaintiff requires a showing that the Defendant (1) acted in a fiduciary capacity

and (2) engaged in fraud or defalcation while acting in such capacity. *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir.1996); *Windsor v. Librandi (In re Librandi)*, 183 B.R. 379, 382 (M.D.Pa.1995). Since I conclude that defendant did not act in a fiduciary capacity as that term is construed in the context of bankruptcy, I need not reach the question of whether he engaged in fraud or defalcation.

 "Fiduciary capacity" generally has a narrower meaning in bankruptcy than its traditional common law definition. The latter, "involving a person who stands in a special relationship of trust, confidence, and good faith, is 'far too broad for the purposes of bankruptcy law.'" *Librandi*, 183 B.R. at 382 (*quoting Matter of Rausch*, 49 B.R. 562, 564 (Bankr.D.N.J. 1985)). According to the Tenth Circuit Court of Appeals, "[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, *see In re Evans*, 161 B.R. [474,] 477 [(9th Cir. BAP 1993)], nor an inequality between the parties' knowledge or bargaining power, [citation omitted], is sufficient to establish a fiduciary relationship for purposes of dischargeability." *Fowler Brothers v. Young (In re Young)*, 91 F.3d at 1372. For the purposes of § 523(a)(4), a fiduciary relationship requires an express or technical trust. *Pennsylvania Manufacturers' Association Insurance Co. v. Desiderio (In re Desiderio)*, 213 B.R. 99, 102–03 (Bankr.E.D.Pa.1997), *Librandi*, 183 B.R. at 382. This more narrow construction of fiduciary capacity is aimed at promoting bankruptcy's underlying "fresh start" policy, *Librandi*, 183 B.R. at 382, and emanates from the decision of the United States Supreme Court in *Davis v. Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), where the Court recognized that bankruptcy law for nearly a century has limited the scope of fiduciary

capacity to technical trusts. *Id.* at 333, 55 S.Ct. at 153–54. Thus, it explained, a trust *ex maleficia*, imposed as a result of the wrongful act out of which the debt arose, does not fulfill the fiduciary capacity requirement. The actor must have been a trustee before the wrong occurred and without reference to it. *Id.* For that reason, implied and constructive trusts are also insufficient to create a fiduciary relationship under § 523(a)(4). *Texas Lottery Commission v. Tran (In the Matter of Tran)*, 151 F.3d 339, 342 (5th Cir.1998); *Librandi*, 183 B.R. at 382 n. 3; *Moribondo v. Lane (In re Lane)*, 76 B.R. 1016, 1022 (Bankr.E.D.Pa.1987).

 Although the question of what constitutes "fiduciary capacity" under § 523(a)(4) is determined by federal law, state law is important in determining whether trust obligations exist. *LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir.1993); *United States v. Bagel (In re Bagel)*, 1992 WL 477052, at *13 (Bankr.E.D.Pa. Dec.17, 1992). An express trust under Pennsylvania law requires that there be a(1) a trustee (2) an ascertainable res, and (3) a beneficiary for whom the property is held. *Sherwin v. Oil City Nat. Bank*, 229 F.2d 835, 838 (3d Cir.1956); *Desiderio*, 213 B.R. at 103. The parties must also manifest their intention to create a trust. *In the Matter of Penn Central Transportation Company*, 486 F.2d 519, 524 (3d Cir.1973). While the execution of a formal document usually establishes the latter requirement, an express or technical trust need not be established by such a writing so long as it is characterized by trust-type obligations imposed under state or common law. *In re Bagel*, 1992 WL 477052 at *12. The Plaintiff must prove the existence of a fiduciary relationship by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 288–89, 111 S.Ct. 654, 660 (1991).

■ Plaintiff does not argue that an express or technical trust was found by the State Court but only that Judge McInerney found that Defendant was a fiduciary. However, as noted above, that finding alone is not dispositive. Bankruptcy requires something more. However, Plaintiff has failed to articulate how the elements of an express or technical trust were established in this case. Simply quoting the court in *Bellity v. Wolfington (In re Wolfington)*, 48 B.R. 920, 924 (Bankr.E.D.Pa.1985), Plaintiff contends that a fiduciary relationship is established where the property of one person is placed in charge of another. *Wolfington* involved a debtor officer/director of a brokerage corporation who had control over the corporate escrow account containing money belonging to the creditor. The res of the trust was the creditor's funds that were misappropriated pending closing of a sale, and the creditor's funds were held in trust for the sole purpose of completing the closing. Plaintiff proffers that case for the proposition that a shareholder that has control over corporate assets is acting in a fiduciary capacity to other shareholders under § 523(a)(4). I find that reading of *Wolfington* to be overbroad.[19] In *Wolfington* the court expressly noted:

> More than a misappropriation of corporate funds was involved here. The misappropriated funds were, in fact, trust funds held in an account in the corporation's name.

*Id.* at 925. In comparison, Defendant, as the operating corporate officer, converted assets of Coin Call that if sold or collected would have generated corporate income. In so doing, he prevented that corporation from generating the profits it historically had earned and passed on to the shareholders, including Plaintiff. Clearly the corporate accounts receivable were not held in trust for the shareholders but rather were to be collected for use as Coin Call's operating funds. By this conduct, Defendant breached his duty of loyalty to the corporation and its shareholders as Judge McInerney found. However, under these facts, I can neither identify an ascertainable res or the trust-like obligations that evidence an intention that a trust be imposed under common law.[20] *See Li-*

**19.** In *Moribondo v. Lane (In re Lane)*, 76 B.R. 1016, 1022 (Bankr.E.D.Pa.1987), the Court declined to follow *Wolfington* which it found utilized the broader general usage or definition of fiduciary contrary to "the weight of authority which gives 'fiduciary' a narrow meaning." Other courts have cited *Wolfington* as persuasive but confined it to its facts as I do here.

**20.** State statutes can also create a technical trust. *See, e.g., Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir.1993) (finding that Georgia statute, in conjunction with insurance contract providing that premiums be held "in trust," created technical trust such that insurance agent acted in fiduciary capacity and insurance premiums paid by plaintiff constituted identifiable res); *Carey Lumber Co. v. Bell*, 615 F.2d 370, 374 (5th Cir.1980) (finding that Oklahoma's lien trust statutes created technical trust). Plaintiff does not contend that the Defendant's purported fiduciary capacity emanates from a statute. My review of the corporate law has uncovered one statute that deals with officer and director liability. 15 Pa.C.S.A. § 512. While it imposes fiduciary duties on a director (but not an officer), they are the general fiduciary duty of confidence, trust, loyalty, and good faith and not the trust-like duties that evidence a technical trust. Construing 15 Pa.C.S.A. § 512(a) in *Burnham v. Bartley (In re Specialty Tape Corp.)*, 132 B.R. 297 (Bankr.W.D.Pa.1991), on facts similar to those presented here, the court in a suit for breach of fiduciary duty noted that directors had a duty of loyalty to the debtor that extended to its shareholders, and "[w]hile *it is not altogether accurate to say that a director is a trustee for the shareholders*, a director is required to manage the affairs of the corporation to promote the common interests of the shareholders, as opposed to his own private interests." *Id.* at 301 (emphasis added). In *Higgins v. Shenango Pottery Company*, 256 F.2d 504 (3d Cir.1958), the corporate officers

*brandi, supra* (because debtor was fiduciary under Pennsylvania Securities Act with respect to customer did not make him a fiduciary for purposes of § 523(a)(4) because he was never entrusted with any of the customer's funds to create a trust res and there were no other special circumstances); *First Valley Bank v. Ramonat (In re Ramonat)*, 82 B.R. 714 (Bankr. E.D.Pa.1988) (corporate officer debtor's failure to use loan proceeds for intended purpose did not constitute defalcation while acting in a fiduciary capacity because the funds were not held in trust and there were no specific fiduciary duties imposed). *See also Kapila v. Talmo (In re Talmo)*, 175 B.R. 775 (Bankr.S.D.Fla.1994) ( officer and director and sole shareholder of non-operating corporation who paid himself $400,000 in satisfaction of allegedly past due salary not acting in a fiduciary capacity in the absence of a state statute creating a trust relationship or case law finding directors or officers to be trustees over corporate assets).[21]

In short, Plaintiff appears to rely merely on the State Court's finding that Defendant breached his fiduciary duty to Harris and has not proven the elements of an express trust which is its burden under § 523(a)(4). Despite the fiduciary relationship Defendant had to Coin Call and

its shareholders, I am unable to find that an express trust existed such that Dawley acted in a "fiduciary capacity" under § 523(a)(4).

### B. *Embezzlement*

Embezzlement is "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Harland,* 235 B.R. at 780 (*quoting* 3 Collier on Bankruptcy, ¶ 523.14[3], at 523–113). Plaintiff must therefore show that Defendant received Harris' property legally,[22] but subsequently misappropriated that property for his own benefit with a fraudulent intent or to deceive. *Spencer v. Blanchard (In re Blanchard)*, 201 B.R. 108, 116 (Bankr.E.D.Pa.1996). Fraudulent intent may be "determined from the facts and circumstances surrounding the act." *C & J Car Rental v. Purdy (In re Purdy)*, 231 B.R. 310, 312 (Bankr.E.D.Mo.1999) (noting that fraud can rarely be directly discerned). Embezzlement does not require the debtor to be acting in a fiduciary capacity.

The findings of the State Court establish that Defendant received Payphone's property legally and was charged with the responsibility of distributing its

---

used corporate assets for their own good without accounting to the shareholders. The Third Circuit Court of Appeals found the relevant principle to be that "[w]here a fiduciary in violation of his duty to the beneficiary causes property to be transferred to another, the other holds the property upon a *constructive trust* if he gave no value or if he had notice of the violation of duty." *Id.* at 510 (emphasis added). While the former two cases do not arise under § 523(a)(4), they elucidate how Pennsylvania law views the conduct that underlies the State Court Judgment.

21. Plaintiff also cites to *Fox v. Shervin (In re Shervin)*, 112 B.R. 724 (Bankr.E.D.Pa.1990) as support for its position. Plaintiff correctly

notes that *Shervin* does not stand for the proposition that Defendant cannot stand in a fiduciary relationship with Harris since it deals with a corporate officer's relationship to creditors not shareholders. While *Shervin* states in *dicta* that the debtor as an officer and director of the corporation stood in a fiduciary relationship with the corporation and its shareholders, it does not discuss, as not implicated by the case, in what way the fiduciary relationship rises to the level of a trust.

22. The legality of the initial control or possession of the property in question is what differentiates embezzlement from larceny. *Id.*

profits to the shareholders in the form of wages. Judge McInerney noted that "[s]ince approximately 1995, William Dawley has been responsible for issuing Payphone's shareholder distributions, managing its checkbooks and delivering appropriate financial information to [Payphone's accountant]," Opinion at 3, and acted "as the shareholder in control." *Id.* at 10. She further found that on and after July 1, 1998 Defendant deposited Payphone receipts with Franbern and converted Payphone accounts to Franbern accounts for his own benefit:

> On July 1, 1998, Mr. Dawley converted the Payphone accounts to Franbern accounts. The Payphone general ledger shows that its business stopped June 30, 1998, after doing a typical six months business. The Franbern general ledger shows that it "resumed" business on July 1, 1998, after being completely non-existent for some ten years. Beginning in June 1998, Mr. Dawley took all of Payphone's accounts and began operating them as Franbern accounts. Beginning July 1998, Mr. Dawley deposited all Payphone receipts into Franbern's bank account. Mr. Dawley continues to transfer all of Payphone's receipts to Franbern. Since July 1998, Mr. Dawley has managed all of Payphone's current and prospective accounts as Franbern accounts, for his own financial gain.

*Id.* at 5 (citation omitted). Judge McInerney also found that while Mr. Dawley was not obligated to run Payphone for the benefit of Mr. Harris and his estate, neither could he just convert Payphone's assets. Rather he could have sold Payphone's accounts or purchased its assets for fair value and distributed the profits from such sale to the shareholders (including himself). Instead he simply converted Payphone's accounts to Franbern. *Id.* at 9. "Through Franbern, Mr. Dawley could take at least one-half of the profits, rather than the one-fifth or one-sixth share that he was receiving through Payphone." *Id.* at 10.

On the question of whether Defendant's appropriation of Payphone assets was done with the intent to defraud or deceive Plaintiff, Judge McInerney has also made dispositive findings. She concluded that Dawley attempted to deceive Harris' daughter by telling her that no profits would be paid to her father due to a drop in Payphone business when Dawley had in fact transferred Payphone's business and income to Franbern.

> In December 1997, Mr. Dawley told Sharon Harris, plaintiff Stanford Harris' daughter (and subsequently his executrix), that after 1997 he would not provide Mr. Harris any more distributions from Payphone. Mr. Dawley stated that Payphone had lost many of its customers, so there would not be any money to pay Mr. Harris from that time on. Mr. Dawley repeatedly asserted that towards the end of 1997, Payphone's business was getting worse. However, Mr. Dawley was not credible, and the evidence does not support his assertion. Dawley's own figures refute his claim. Payphone's fourth quarter 1997 revenues were $107,000, larger than those from the first quarter of that same year.

*Id.* at 4–5. Judge McInerney found that "Dawley's motives were obvious." *Id.* at 10. According to her findings, Dawley's "partners were now ill, deceased, or retired[23] and as far as he was concerned the partnership was 'over.'" In light of this,

---

**23.** Harris had suffered two small strokes in 1994 and retired from participating in Payphone's day to day business affairs. In 1995, Gerald Fischer suffered an incapacitating stroke, leaving him unable to work. In April 1998, Harvey Fischer died of cancer, after being ill for more than one year. In November 1999, Harris passed away. *Id.* at 4. The

"Dawley felt he had no obligation to continue sharing the profits when no one else was involved in the day to day operation." *Id.* Rather than do so, he converted the assets to Franbern for his benefit and provided false information to Plaintiff's daughter that the assets no longer generated a profit to be distributed.[24] Dawley's appropriation of Payphone assets, therefore, was made with intent to defraud or deceive.

Had Payphone been the Plaintiff here, it is clear that an action for embezzlement would be proven. However, there is a disconnect between the property that has been misappropriated, *i.e.*, the revenues and accounts *of Payphone*, and the lost shareholder distributions that form the basis of the debt sought to be discharged. The Judgment represents Judge McInerney's quantification of the profits that would have been paid to Plaintiff had Payphone not been deprived of its business. As those profits never existed, they could not have been in Defendant's control to misappropriate. In order to prove embezzlement under § 523(a)(4), the Plaintiff must establish that its property was misappropriated. *Sullivan v. Clayton (In re Clayton)*, 198 B.R. 878, 885 (Bankr.E.D.Pa. 1996) (creditor failed to prove debtor managing director embezzled from creditor as opposed to the corporation whose money

he used rather than paying corporate debt to creditor); *Lee v. Crosswhite*, 91 B.R. 156, 159 (Bankr.M.D.Fla.1988) (debtor's use of partnership funds as his own and for other purposes than payment of partnership expenses presents a viable claim for embezzlement on behalf of the partnership, not the plaintiff partner); *Ramonat, supra*, 82 B.R. at 720 (lender did not state a claim for embezzlement where the advances by a new lender intended to pay it were misdirected and not the monies it had entrusted to the debtor).

Thus, the State Court Opinion contains sufficient findings that establish the elements of embezzlement of Payphone assets but not of property belonging to Plaintiff. Absent a basis in the record to find that Defendant abused his position of control to unlawfully appropriate Defendant's property, a claim has not been proven under this prong of § 523(a)(4) either.[25]

Having concluded that § 523(a)(4) does not provide a legally sufficient basis to except the Judgment from discharge, I turn now to Plaintiff's case under § 727 to determine whether legally sufficient grounds have been establish to accomplish the same result.

## II. Objection to Discharge Under Section 727

The discharge provisions of Section 727 are the "very breath of the

---

remaining shareholder, Greenstein, was Defendant's partner in Franbern, the recipient with Defendant, of the Payphone converted assets.

**24.** Judge McInerney notes that Dawley had a number of options to legitimately discontinue paying profit distributions to Harris. She notes that "[a]s his shareholder partners became ill or died, defendant Dawley would have been able to pay himself a salary from the profits for running the business by himself, or he could have taken steps to close the company." *Id.* at 11. She also points out that "Mr. Dawley could have sold Payphone's accounts or, Mr. Dawley could have pur-

chased Payphone's accounts and assets—its business, for fair value." *Id.* at 9. He did neither as he intended not to share the profits of Payphone to which Plaintiff was entitled with him.

**25.** As embezzlement was not a cause of action before the State Court, it is perhaps not surprising that Judge McInerney did not make a connection between the revenues transferred to Coin Call and the distributions to be paid the shareholders. Nor did the Plaintiff present a legal construct for finding that the conversion of Payphone assets was the embezzlement of Plaintiff's future profits.

'fresh start' created by the Bankruptcy Code" and "this breath can be snuffed out only by proof of conduct expressly prohibited by the Code." *Bank of Chester County v. Cohen (In re Cohen)*, 142 B.R. 720, 726 (Bankr.E.D.Pa.1992). *See also Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir.1993). The importance of this right to discharge requires the Court to construe objections to discharge strictly against the objector and in favor of the debtor. *See Rosen*, 996 F.2d at 1531; *In re Decker*, 595 F.2d 185, 187 (3d Cir.1979).[26] Plaintiff must prove by a "preponderance of the evidence" the conduct warranting denial of the discharge. *Grogan v. Garner*, 498 U.S. 279, 288–90, 111 S.Ct. 654, 660–61, 112 L.Ed.2d 755. Plaintiff contends that Defendant's action warrant denial of discharge under § 727(a)(2) and (a)(4).

## A.

■■■■ Under § 727(a)(2)(A), the Plaintiff must establish that (1) the Defendant transferred, removed or concealed property; (2) the property belonged to the Defendant; (3) the action occurred within one year of the filing of the Defendant's bankruptcy petition; and (4) the Defendant, contemporaneously with the action, intended to hinder, delay and defraud a creditor. *Cohen*, 142 B.R. at 725.[27] Since acknowledgment of actual intent to defraud is unlikely, actual fraudulent intent may be ascertained by circumstantial evidence or inferences drawn from a course of conduct. *Rosen*, 996 F.2d at 1533;

*Henderson*, 134 B.R. at 157; *Giel v. Brooks (In re Brooks)*, 58 B.R. 462, 465 (Bankr.W.D.Pa.1986).

■■■■ Plaintiff contends that Defendant's transfers of his interest in Coin Call and Franbern during the year preceding the filing of the bankruptcy petition were with an intent to hinder, delay or defraud Harris and merit denial of his discharge under § 727(a)(2)(A). Specifically it argues that the payments to which Defendant was entitled were directed to him and Judith or to Judith alone in order to hinder the Harris Estate from collecting on the Judgment. These payments were the proceeds of equity interests in Coin Call and Franbern owned by Defendant individually. To evaluate these contentions, an examination of the transfers is necessary.

In March 1, 1999 the assets of Coin Call were sold to Elgee–Savar with the balance of the purchase price to be paid in 24 monthly installments of $8,225.25 commencing April 15, 1999. Exhibit P–5. At that time Plaintiff had already served a writ of summons in the State Court Action, and the Complaint followed soon after. Exhibit P–1. Originally the payments were made to the corporation Coin Call, Exhibit P–7, and presumably distributed to the shareholders equally thereafter. Defendant deposited his payment in his joint bank account with Judith. On May 15, 2000, Elgee–Savar made a payment by check directly to William Dawley which

---

26. As noted above, with only one claim sought to be discharged, a successful § 727 action would be no different than a successful § 523 action in this case. Generally the consequence of a § 727 denial of discharge is harsher than the failure to discharge one debt under § 523 and the strict standard enunciated above reflects that reality. consequence of a § 727 denial of discharge is harsher than the failure to discharge one debt under § 523

and the strict standard enunciated above reflects that reality.

27. Section 727(a)(2)(B) requires the same showing except the action relates to property of the estate transferred after the filing of the petition. While included in the Joint Pretrial Statement as an issue presented in this case, no post-petition transfers are addressed in the Plaintiff's post-trial memorandum or testimony at trial.

was also deposited in the joint account. Exhibit P–9. The next installment made on June 15, 2000 and future installments, however, were paid by check to William *and Judith* Dawley, and they too were deposited in their joint account. Uncontested Fact ¶ 6; Exhibit P–10. A final payment in the amount of $31,048.37 was made prematurely on July 15, 2001 to William and Judith Dawley. Uncontested Fact ¶ 11; Exhibit P–11. Like the prior payments, this check was initially deposited in the joint bank account but contrary to past practice, was quickly transferred by Judith to her individual account and ultimately to the home safe. Exhibits P–12,13,14. It is clear from this chronology that transfers of the Defendant's property were made to Judith within one year of bankruptcy and that Judith provided no consideration for the transfers.[28] Specifically, the installment payments made between August 30, 2000 and May 15, 2000 totaling $16,512 plus the lump sum paid on June 15, 2000 in the amount of $31,048.37 were transfers of property of the Defendant within one year of the petition. The dispositive issue, as Plaintiff recognizes, is whether the transfers were made with intent to defraud, hinder or delay a creditor. Plaintiff's Post–Trial Memo at 12.

In support of its contention that the foregoing transfers were fraudulent as to the Harris Estate, Plaintiff points to the timing of the change in the method of payment *vis a vis* the State Court Action. Notably the February 2000 Judgment had become final on June 9, 2000, Uncontested Fact ¶ 5; Exhibit P–1, and the payments to William *and* Judith Dawley, versus Coin Call or Defendant, began on June 15th. Moreover the installment payments ceased on July 15, 2001 with an early payoff, again to the benefit of William *and* Judith. Absent any explanation for the juxtaposition of these two events, the direction of payment to Judith after the entry of the Judgment presents very probative circumstantial evidence of intent to defraud.

Defendant did not attempt to justify the handling of the payments. The explanation was forthcoming from others. According to Greenstein, it was he who requested Elgee–Savar to write the checks to William and Judith so that Defendant would not dissipate the monies on alcohol. While I am persuaded that it was Greenstein's idea, not Elgee–Savar's, that the purchase obligation be paid off early, there is no evidence that Defendant had any part in that action. While he was aware of the lump sum payment and endorsed the check, the early cash out appears to have been prompted by Greenstein in collaboration with Judith.[29] Finally it was Judith's

---

**28.** This also would have been the case if the property was owned as tenants by entireties but as it was not, the economic consequence of the transfer was greater.

**29.** Greenstein's motivations are not clear. He claims his actions were prompted by concern for Defendant and Judith as a result of Defendant's impairment from alcoholism. The evidence is inconsistent. He bought Defendant out of Franbern because he was a "disaster" yet he insists his Franbern payments are wages. Defendant's assigned job is to call on bars to place video poker machines, an unlikely delegation of duties to an alcoholic. He wanted to make sure monies owed Defendant got home so he took it upon himself to have Judith named a payee and raised his "salary" because Judith advised him the current wages were insufficient to live on. Greenstein was the beneficiary with Defendant of the transfer of the Payphone assets to Franbern. He seems to have escaped financial accountability, unlike Defendant. Notably Greenstein made certain statements that suggested he felt some vulnerability to claims against him by Judith. In any event, Greenstein's testimony is colored by bias—whether resulting from his long business relationship with Defendant, hostility to the Plaintiff or potential claims by Judith. He also was disingenuous when attributing the Payphone

testimony that she moved the $31,048.72 lump sum payment from the joint account to her own account to insulate those funds from the reach of the Plaintiff's execution. Conspicuously absent is any evidence of Defendant's knowledge or participation in the handling of the funds. When questioned, Defendant had little recollection beyond receiving checks once a month and then obtaining the final installment.[30] Since the funds were deposited in the existing joint account as had always been the case, there was no real change in the handling of the funds facilitated by the change in the payee of the checks from Defendant to Defendant and Judith.[31] Obviously that was not the case when the $31,048.72 payment was moved from the joint account to Judith's individual account. However, there is no evidence that implicates Defendant in that transfer. Thus, while it was Judith's intent to hinder Defendant's creditor, her intent is not dispositive of § 727(a)(2). On this record, there-

fore, I cannot find that Defendant had the intention to defraud Harris.

## B.

With respect to § 727(a)(4)(A), it is well recognized that a debtor has an affirmative duty to disclose all his assets and liabilities and to answer fully and truthfully all questions so as to present creditors with a complete and accurate account of his financial condition. However, a debtor's loss of the discharge by reason of the failure to fulfill that duty only occurs when the information is omitted or misstated knowingly or fraudulently and the omitted information is related to a material fact.[32] *Henderson*, 134 B.R. at 160. A false oath or statement is considered "material" for the purposes of § 727(a)(4)(A) if it concerns the discovery of assets, business transactions, and/or past business dealings of the debtor or the existence or disposition of the debtor's property. *Id.* (citing cases). *See also In*

---

cash out to Elgee–Savar when he was the one who initiated it.

30. While at the § 341 meeting he recalled receiving the check, he could not recall it when questioned at the trial. Defendant's testimony at the § 341 meeting, as reflected in the transcript, was more concrete and responsive than at the trial where his answers were more vague.

31. It would appear that the only benefit of the joint payee would be that Defendant would have to bring it home, *i.e.,* he couldn't deal with it without Judith knowing about its existence since she would have to endorse it as well. That ensured it was deposited in the joint account (instead of spent by Defendant).

32. As stated by the court in *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir.1987):

The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy.... In that vein, the statutory right to a discharge should ordinarily be construed

liberally in favor of the debtor. [citations omitted]. "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir.1934). On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Mascolo*, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. [citations omitted]. The bankruptcy judge must be deft and evenhanded in calibrating these scales.

*re Steiker*, 380 F.2d 765, 768 (3d Cir.1967). Proof of failure to disclose alone is not sufficient to establish the element of intent. *Henderson*, 134 B.R. at 160. If a false statement or omission of fact in a Statement of Affairs or a Schedule is due to mistake, the discharge is generally not denied. *Id.* at 162; *Brooks*, 58 B.R. at 467. This is especially true when the omitted fact is the only such information that has been omitted.

 The Trustee testified to a number of omissions [33] and false statements in the Defendant's disclosure, and in so doing, the burden shifted to the Defendant to come forward with evidence that he had not committed the offense charged. *Steiker*, 380 F.2d at 768. *See also In re Mascolo*, 505 F.2d 274, 276 (1st Cir.1974). The Defendant's explanation is that he disclosed all relevant facts to his attorney and relied upon him completely for preparation of his bankruptcy papers. In turn, Gold took total responsibility for the omissions and errors in the documents, contending they were the result of his misunderstanding of bankruptcy law and procedure. With respect to the Defendant's failure to schedule certain New Jersey real estate and any bank accounts, Gold testified that Defendant made him aware of these assets. Gold made the determination not to schedule them because the value of the land was *de minimus* [34] and he believed that property held as tenants by entireties, as were the bank accounts, was not property of the estate and did not need to be scheduled. Gold relied on his lack of experience in bankruptcy cases to justify the errors. The credibility of his explanation is undermined by the fact that he listed many assets with the designation "t/e" that were admittedly held as tenants by entireties, evidencing his recognition that entireties property should be scheduled. His explanation is also belied by his following the form Schedule instructions, indicating for each asset listed the appropriate designation required by the form template as to the nature of the ownership interest: husband ("H"), wife ("W"), joint ("J") or community ("C"). Notably these forms are prepared in simple language such that debtors are able to complete them without the assistance of an attorney. They require no legal judgments nor bankruptcy expertise. Debtor should have easily noted the omission of his joint bank accounts when many other joint assets were listed. *See Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249, 251 n. 2 (4th Cir.1987) (omission of bank accounts because of belief that the debtor had no interest in the joint account with his girl-

**33.** One such alleged omission, however, is unpersuasive. The Plaintiff points to the failure to disclose a loan/gift of $15,000 to Judith's sister made during the year prior to the bankruptcy case. Judith's testimony is incomprehensible on this subject. Quite frankly I do not know what she and her sister were up to. It appears that they were conspiring to hide some payment from her sister's estranged husband by Judith advancing a $15,000 certified check from *her individual account* at Mellon for her sister's use. Exhibit P–12. However, there is no evidence that *Defendant* made a loan or gift to Judith's sister or even knew about the convoluted transaction so I fail to understand what disclosure obligation he breached.

**34.** Plaintiff points out that Defendant paid $13,000 for his 25% undivided interest in this New Jersey swampland used for duck hunting. Defendant had an obligation to disclose this asset without regard to its value. That an asset is worthless is not a defense. *Eastern Diversified Distributors, Inc. v. Matus (In re Matus)*, 303 B.R. 660, 677 (Bankr.N.D.Ga. 2004). However, standing alone the failure to disclose this asset is not likely to be material given its questionable value to the estate due to its limited use and Defendant's partial ownership. In amelioration, this asset was disclosed at the § 341 meeting.

friend rejected as the Statement of Financial Affairs asks the identity of all bank accounts maintained in own name or with any other person). The omission of the joint bank accounts was material. As noted below, the disclosure of the joint Fleet account where the Undisclosed Cash was originally deposited would have led to the discovery of Judith's transfer of those funds to her individual account.

In addition to the foregoing omissions from the Schedules, the Trustee also established the inaccurate disclosures regarding the ownership of Coin Call and Franbern which are referenced in the Statement of Financial Affairs as sales of property owned by husband and wife. Exhibit 46A. Indeed the Trustee pursued this subject at the § 341 meeting, asking the Defendant how much of the proceeds of the sale of Coin Call he received. When Defendant stated "half of it," Gold interrupted:

> Gold: Can I clarify something. When you say "you," do you mean he alone or he and his wife, cause there's a difference.
> Shubert: He hasn't mentioned her at all.
> Gold: Well, a misperception.
> Dawley: I'm understanding what you are saying.
> Shubert: Well, you owned a company called Coincall.
> Dawley: That's correct
> Shubert: Did you own 100% of that company?
> Dawley: No.
> Shubert: Who owned the rest of it.
> Dawley: Bernard Greenstein, my wife and his wife.

Exhibit 45, Transcript at 4–5. To the Trustee's subsequent inquiry as to whether the stock of Coin Call was always held as husband and wife and always as tenants by entireties, Defendant not surprisingly responded affirmatively. *Id.* Gold was silent. Gold's explanation for this misrepresentation was that the stock ownership was marital property under Pennsylvania law. Notably Gold was the attorney who handled the transaction and knew that the stock was owned by Debtor individually. While not a bankruptcy lawyer, Gold is a member of the Pennsylvania bar who has practiced since 1975 and certainly should know the difference between property owned individually and that owned as tenants by entireties. While Greenstein and Defendant's mutual lay opinion that their stock was owned with their wives because they are marital partners might have some believability, Gold's contentions are not credible. When I factor in Gold's apparent coaching of Defendant at the § 341 meeting when the subject of the ownership of the stock was raised by the Trustee and Defendant's response ("I'm understanding what you [*i.e.,* Gold] are saying"), I am left with the uncomfortable impression that the joint ownership theory may have been concocted to protect the proceeds of the asset sale from Defendant's creditors. If that was the strategy, Defendant's part in it is not clear. That he was aware that the description of the interest in Coin Call was legally erroneous, as I conclude Gold was, has not been established. However, clearly Defendant knew, but did not disclose, that the sale proceeds had been sent to him individually until Judith was added as payee on the checks. To that extent he knew that, the statement regarding those payments "all joint with wife" in the Statement of Affairs ¶ 2 was simply false. Disclosure of that information would have put the Trustee on notice to investigate further the ownership in Coin Call, including securing the tax returns which would have clearly revealed that Judith did not own the stock jointly with Defendant. This was a material omission and false state-

ment by Defendant that obstructed the Trustee from recovering the Undisclosed Cash.

 Explanation that a debtor relied on the advice of his counsel who was generally aware of all relevant facts may be an excuse for an inaccurate or false oath by demonstrating that the necessary fraudulent intent is lacking. *In re Topper,* 229 F.2d 691, 693 (3d Cir.1956). *See also Mascolo,* 505 F.2d at 277 (explanation that debtor acted on advice of counsel who has been advised of all facts generally rebuts inference of fraud). To justify the omission by a debtor of property from his schedules on the ground that he acted on advice of counsel, it must be shown that he fully and fairly stated the facts to the counsel and acted on his opinion as a matter of law only. *In re Russell,* 52 F.2d 749, 754 (D.N.H.1931). It may be that a debtor's description of the transaction caused his attorney to improperly analyze the transaction but absent evidence that the debtor attempted to mislead his counsel, the requisite intent cannot be inferred from the failure to disclose. Likewise a debtor cannot be penalized for the failure of counsel to elicit the facts or understand the law in order to properly advise the debtor as to his duties of disclosure. Neither were the situation here. Gold knew that the stock was owned by Defendant alone and did not have to rely on Defendant to describe the transaction; his misunderstanding of the law is simply unbelievable.

 "Nor can an attorney's willingness to bear the burden of reproach [for misstatements and omissions] provide blanket immunity to a debtor; it is well settled that reliance upon advice of counsel ... is no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules." *Tully,* 818 F.2d at 111 (citing cases). As that court aptly stated: "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *Id.* In *Rafool v. Wilson (In re Wilson),* 290 B.R. 333, 340 (Bankr.C.D.Ill.2002), the court found that a debtor had "stuck his head in the sand" with respect to preparation of the statement of financial affairs and bankruptcy schedules when he allowed his wife to prepare those documents without consulting him and he failed to read them. Defendant seeks to distance himself from the false Schedules and Statement of Affairs by contending that he simply relied on Gold for their preparation. Yet "[d]ebtors have the ultimate responsibility for the accuracy of their schedules which cannot be avoided by playing ostrich," *id.,* which is precisely what Defendant seeks to do.

 Plaintiff contends that Defendant relies on his alcoholism to excuse his omissions and false statements. While Defendant has not argued as much,[35] I agree that he appears to be suggesting by the testimony of Gold, Judith and Greenstein regarding Defendant's drinking that an exception is warranted and Defendant's condition should negate a finding of fraudulent intent. I also agree that I am unable to properly evaluate the significance of this information as no expert testimony was elicited and the witnesses to testify on the subject were Defendant's wife, partner and lawyer, all of whom appeared biased. The Trustee, on the other hand, stated that she did not perceive any impairment at the § 341 meeting. A review of that tran-

---

**35.** Nor was any defense of diminished capacity raised in the Answer to the Complaint or the Pretrial Statement. While I do not doubt the existence of Defendant's alcohol problem, I have no way of evaluating its impact on his ability to fulfill his duties as a debtor.

script did not reveal any difficulties responding to the Trustee's questions. Since the burden is on the Defendant to explain his false statements, this failure of proof undermines any such defense.

Even assuming I were to find that Defendant's condition is an adequate explanation for his false Schedules and Statement of Affairs, it would not exonerate him from his failure to disclose the $31,048.72 cash to Gold who then omitted it from the Schedules. This was a material omission that tips the scales decisively against his discharge. Schedule B identifies cash of $200 and no bank accounts, both false statements. Defendant was questioned at the § 341 hearing by Plaintiff's counsel concerning the location of the final payment from Elgee–Savar that he received between July 15, 2001 and July 24, 2001 and responded that he believed it had been deposited in Judith's account at Mellon.[36] When asked where the funds were now, he replied "[w]e lived on it." Exhibit 45, Transcript at 15–16. Defendant's misstatement about the Undisclosed Cash prevented the Trustee from recovery of the only liquid asset of this estate until it was substantially dissipated. As the Trustee noted, had that asset been disclosed, she would have taken further steps to investigate. Instead all but $9,550 was spent from the time of the filing of the petition until the Trustee secured a temporary restraining order and recovered what was left, a period of less than eight months.

Only then did the Defendant disclose the cash by amending his Schedule B.

Once Defendant determined to seek bankruptcy protection, he had a duty to disclose all his assets so that the Trustee could properly administer his estate. He was aware of extraordinary income of over $30,000 received within months of bankruptcy. I find his claims that he had no knowledge that any part of it existed when he filed for bankruptcy protection and prepared his Schedules not credible. I am unpersuaded by Defendant's explanation that no disclosure was made because he believed the Undisclosed Cash was spent. He provided no basis for that belief. He did not state that Judith told him as much, and indeed he disclaimed any effort to examine the bank statements. *See Casey v. Kasal*, 223 B.R. 879, 885–86 (E.D.Pa. 1998) (fact that debtor had not consulted the auctioneer about the value of the artwork contributed to the court's disbelief of the value attributed to the asset by the debtor). He provided no explanation as to how his salary from Franbern which he continued to receive plus an additional $31,048.72 had been spent between receipt of the payment in late July and the § 341 meeting two months later. Not withstanding the critical duty of disclosure, he apparently made no inquiry about the existence of the Undisclosed Cash when he prepared and filed his Schedules and proceeded to respond to the questions posed at the § 341 meeting falsely with no equivocation. He had a duty to make that

---

**36.** On or about July 19, 2001 Defendant endorsed the Check and gave it to Judith. Exhibit P–11. As noted, he stated that he was aware that unlike prior deposits into the Dawley's joint account, she was depositing it in her individual account. That he claims not to know that she had subsequently removed it from that account and placed it in the attic safe is irrelevant. His failure to disclose the existence of the cash, wherever it was secreted, is the issue. The deposit for the first time

in the individual account shortly after the Judgment, even without regard to the subsequent transfer to the attic safe, suggests an intention to conceal the Undisclosed Cash from Defendant's creditors. While the actor may have been Judith, Defendant was aware of the steps that were taken and as such, his "reckless indifference to the truth is the equivalent of fraud." *Matus*, 303 B.R. at 678 (quoting *Diorio v. Kreisler–Borg Constr. Co. (In re Diorio)*, 407 F.2d 1330 (2d Cir.1969)).

inquiry and having failed to do so, he could only state that having given control of the funds to Judith, he did not know what amount remained. Failing to at least testify honestly as to his lack of knowledge, he cannot now rely on that lack of knowledge to justify his false representation as to the amount of cash in his estate. The failure to disclose the $31,048.72 in the context of the other omissions and misstatements and the failure to amend the Schedules except when the cash was uncovered (and never with respect to the improperly designated joint property) evidences a pattern of concealment warranting the conclusion that more than oversight and mistake were responsible. The cumulative effect of the foregoing pattern of omissions and misstatement of material information, is to undermine Defendant's right to a fresh start. For that conduct, his discharge will be denied under § 727(a)(4).

## CONCLUSION

For the foregoing reasons, I find that Defendant's discharge must be denied pursuant to 11 U.S.C. § 727(a)(4). An Order shall be entered consistent with the foregoing Memorandum Opinion.

### *ORDER*

**AND NOW**, this 16th day of April 2004, upon trial of the Complaint of the Estate of Stanford Harris (the "Plaintiff") and for the reasons stated in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that Judgment is **GRANTED** in favor of the Plaintiff. The discharge of the debtor William Dawley is **DENIED** pursuant to 11 U.S.C. § 727(a)(4).