413 A.2d 379

**In re ESTATE of Mary TRBOVICH, Deceased.**

**Appeal of Natalie and Stella PAVLOVICH.**

Supreme Court of Pennsylvania.

Argued Sept. 18, 1979.

Decided Feb. 1, 1980.

Reargument Denied April 29, 1980.

584

Norbert A. Michalski, Pittsburgh, for appellant.

Wendell G. Freeland, Richard F. Kronz, Freeland & Kronz, Pittsburgh, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, NIX, MANDERINO, LARSEN and FLAHERTY, JJ.

## OPINION OF THE COURT

NIX, Justice.

This is an appeal from the Chancellor's decree finding that the record established an oral or parol trust in favor of the decedent's son in certain bank accounts and bonds which decedent had transferred in her lifetime to Natalie and Stella Pavlovich, close friends of decedent. Exceptions were filed and argued before the court *en banc* and were dismissed. Natalie and Stella Pavlovich have now appealed charging that the evidence was insufficient as a matter of law to support the finding of a parol trust and that the Chancellor abused his discretion in permitting recovery upon a ground that was inconsistent with the pleading and theory of appellee during the hearings below. We find both of these contentions to be without merit and affirm the decree of the learned Chancellor.

Professor Austin Scott made the following pertinent observation:

At common law there are important distinctions between an instrument under seal and other instruments or oral transactions; but the common law seldom attached impor-

tance to the distinction between a written instrument and transactions not evidenced by a written instrument. It is only by such statutes as the Statute of Frauds and the Statute of Wills that a writing as such becomes of legal significance. The tendency in modern law, however, is to minimize the importance attached to a seal and to enlarge the importance of the distinction between written instruments and oral transactions.

I A. Scott, *Scott on Trusts* § 39 at 308–9 (3d Ed. 1967).

■ Although our law recognizes a parol inter vivos trust of personalty, *see* 6 Hunter, *Pa. Orphans' Court*, § 6 (1974), the trend referred to by Professor Scott is reflected in the burden placed upon the proponent of such a trust to establish its existence. Our cases require proof that is "clear, precise and unambiguous." *Kerwin's Estate*, 371 Pa. 147, 89 A.2d 332 (1952). The acts performed and words spoken must admit to no other interpretation than the creation of a trust. *Gribbel v. Gribbel*, 341 Pa. 11, 17 A.2d 892 (1941). "[U]nless the evidence of an oral trust is of the highest probative value, equity should not act to convert an absolute ownership into an estate of lesser quality." *Policarpo v. Policarpo*, 410 Pa. 543, 545, 189 A.2d 171, 172 (1963); *Sechler v. Sechler*, 403 Pa. 1, 7, 169 A.2d 78, 81 (1961). No part of a parol trust can be left to inference; the proof must be clear and specific in all particulars. *Brickell v. Earley*, 115 Pa. 473, 8 A. 623 (1887).

■ Since the Statute of Frauds, Act of April 22, 1856, P.L. 532, § 4, 33 P.S. § 2, requiring trusts in realty to be in writing, has no applicability to trusts in personalty, an express parole trust in personalty, if established, will be enforced.[1] *Keller v. Keller*, 351 Pa. 461, 41 A.2d 547 (1945). Further, since we are here concerned with an alleged inter vivos express trust the formalities required by the Wills Act,

1. Although an implied or constructive trust in realty is not prohibited by the Statute of Frauds, an express parol trust in realty is invalid and is enforceable or unenforceable at the option of the promissor. *Kalyvas v. Kalyvas*, 371 Pa. 371, 89 A.2d 1819 (1952); *Barrett v. Heiner*, 367 Pa. 510, 80 A.2d 729 (1951); *Gray v. Leibert*, 357 Pa. 130, 53 A.2d 132 (1947); *Barry v. Hill*, 166 Pa. 344, 31 A. 126 (1895).

Act of December 10, 1974, P.L. 867, No. 293 § 6, 20 Pa.C.S.A. § 2501 et seq., are not applicable. 20 Pa.C.S.A. § 2515. While the intent to create an express trust must be manifested by the settlor in order to create the trust relationship, the manifestation of that intent need not be in any particular form of words or language, provided that every element of a completed trust is present. *Bair v. Snyder County State Bank*, 314 Pa. 85, 171 A. 274 (1934). The settlor's intention may be couched in any language provided that it is sufficiently expressive of the intention to create a trust. *Converse v. Hawse*, 326 Pa. 1, 190 A. 899 (1937); *Keller v. Keller*, 351 Pa. 461, 41 A.2d 547 (1945).

> In reviewing the evidence to determine the existence of a trust the situation of the settlor and the beneficiaries, financial and otherwise, their relation to each other as well as the purpose for which the trust was created, and circumstances under which it is to be administered must be given due consideration. All the evidence and surrounding circumstances must be considered as an entirety; isolated facts and circumstances are ofttimes misleading and do not present a true picture.

*Keller v. Keller*, 351 Pa. 464, 41 A.2d at 549.

With these general principles in mind, we now turn to the evidence and circumstances of this case to evaluate appellants' contention that the record does not support a finding of an express inter vivos trust. Appellee, Sam Trbovich, was the only surviving child and heir of Mary and Theodore Trbovich.[2] Theodore died on October 16, 1969 and Mary died on May 7, 1976. The Chancellor found and the record amply supported that Mary "loved her son, Sam, was devoted to him, was protective of him and wanted him to be with her."[3] Mary and Theodore purchased a home for Sam in 1969, in which Mary lived with Sam and his wife during the last years of her life. A strong bond of affection between

**2.** The oldest son of the family was killed in war.

**3.** Mary and her husband made "Joint and Mutual" wills on September 24, 1958 passing all of their property to Sam. This disposition was not changed by Mary during her lifetime.

mother and son continued until the death of Mary. However, Mary did not enjoy a close relationship with Sam's wife.[4] The family attorney, a cousin of Mary's and the scrivener of her will, testified that Mary wished to "by pass" Sam's wife in disposing of her property. Mary was also concerned that Sam might "squander" money at the race track.

During her lifetime Mary transferred to Natalie Pavlovich and her mother, Stella, a number of items of personal property. Some of this property was recovered by Sam, the remainder forms the basis of this lawsuit. The evidence relating to the property Sam recovered is as follows:

(a) 125 Series E U. S. Savings bonds, owned by Mary, each being in the denomination of $50.00. These are all registered in the names "Sam Trbovich or Mrs. Mary Trbovich." Sometime prior to Mary's death custody of these bonds was transferred to Michael Pavlovich, the husband of Stella and the father of Natalie. The title of the bonds remained unchanged. After Mary's death, by arrangement with Sam Trbovich and Michael Pavlovich made at the Musulin Funeral Home, Sam signed and cashed 65 of the bonds in order to pay the funeral bill for his mother in the sum of $2,539.68. The remaining 60 bonds came into the possession and control of Natalie Pavlovich who refused to give them to Sam. In March 1978, after inquiry at the U. S. Treasury Department, Sam was permitted to redeem the 60 bonds registered in his name and he received the redemption value of $3,145.00 for them ($52.40 per bond).

(b) Mary also had a certificate of deposit in the Dollar Savings Bank registered in her name "in trust for Sam Trbovich." The title of this certificate was not changed and it was delivered by Mary in her lifetime to Natalie Pavlovich who did not surrender it to Sam after his mother's death. On April 29, 1977, Sam was able to obtain from Dollar Savings Bank the proceeds of this certificate, in the sum of $3,261.00, through proper identi-

4. Sam and his wife divorced after Mary's death.

fication of himself as the owner and an explanation of the reason why he could not produce the certificate.

The evidence submitted concerning the disputed items of personal property was as follows:

(a) Savings Bank account opened by Mary on August 31, 1972 at the Pittsburgh National Bank with an initial deposit of $9,108.52. This account was opened in the name of "Mary Trbovich in trust for Sam Trbovich." On August 15, 1975 the decedent withdrew all of the money, $10,511.55 in the account and opened, on the same date, a new account in the names of Natalie Pavlovich and Stella Pavlovich.

(b) A certificate of deposit, purchased by Mary on November 12, 1973 from the Iron and Glass Bank of Pittsburgh, in the sum of $6,146.44, titled in the name of "Mary Trbovich in trust for Sam Trbovich." On November 12, 1975, Mary exchanged this certificate, which then had a value of $6,906.13 for a new one which she caused to be registered in the names "Natalie Pavlovich or Stella Pavlovich." On November 12, 1976, the registered owners obtained a new certificate in their names in the sum of $7,320.49. On November 11, 1977, after Mary's death, this certificate was cashed and a cashier's check in payment thereof in the amount of $7,759.72 was drawn and delivered to "Natalie or Stella Pavlovich." This check was endorsed by Natalie Pavlovich.

(c) A savings account opened on November 12, 1969 in the Iron and Glass Bank in the name of "Mary Trbovich or Sam Trbovich" with an initial deposit of $2,000.00. On July 6, 1970 the title of the account was changed to "Sam Trbovich, in trust for Mary Trbovich." On August 31, 1972 the title of this account was changed to "Mary Trbovich in trust for Sam Trbovich." On May 15, 1975 the title of this account was changed to the names of "Stella Pavlovich or Natalie Pavlovich or Mary Trbovich" as the registered owners. There were no deposits into or withdrawals from this account between 1973 and May 4, 1976. On the latter date—May 4, 1976—which was three

days before Mary died, Natalie Pavlovich withdrew an additional sum of $2,000.00 from this account. On May 7, June 30 and July 9, 1976, Natalie Pavlovich withdrew the balance of $569.24 from this account.

The evidence of appellants' admissions of the trust consisted of a statement of Natalie to the family attorney at the funeral home that she had the money "to take care of things," and that "she was to give the money to Sam as he needed it." During the "mercy dinner," Natalie stated that, "I have some money and bonds for Sam." Appellants' made no attempt to dispute the statements attributed to them.

■ The strong bond of affection between mother and son, that he was the actual object of her bounty, that Mary was anxious to place any gift for her son out of the reach of her daughter-in-law and to protect him against his penchant for gambling, the admissions by appellants that the property was being held by them for Sam, that appellants made no attempt to exercise dominion and control over the property until May 4, 1976, four days before Mary's death, although the transfers had begun as early as May of 1975, combine to provide the persuasive and compelling quality of evidence necessary to establish an oral trust in these disputed items of personal property. Recognizing the traditional deference accorded to the Chancellor's factual findings where they have been affirmed by the court *en banc* and are supported by the record, *Lux Est.*, 480 Pa. 256, 389 A.2d 1053 (1978); *Gelb Est.*, 425 Pa. 117, 228 A.2d 367 (1967), we are satisfied that the appellee's evidence established an inter vivos express oral trust in the disputed items of property.

■ The second question to be considered is whether the pleadings raised the issue of the existence of an oral trust. Appellants argue that the learned Chancellor, "on his own initiative, proceeded to relate to a theory which was totally irreconcilable with the theories and allegations advanced by appellee, . . . ." An examination of the pleadings in this case contradict this contention. The initial pleading entitled, "Petition for Issuance of a Citation," filed by

appellee as executor of the estate of his mother, charged that appellants had obtained assets of the estate through artifice and deceit and had used fraud, coercion and undue influence upon the decedent. In response to a preliminary objection for a more specific pleading, appellee filed an "Amendment to Petition for Issuance of a Citation" which contained the following allegation:

14. Petitioner was told by the decedent that the respondents convinced decedent to transfer her money which had previously been held in trust for the Petitioner, her only son and heir under her Will, to the respondents with their assurances that they would give the money to her son, the Petitioner, as he requested it and she could thereby be assured that Petitioner's wife would get no part of the money.

In a petition filed on behalf of appellee to reopen the testimony, the following allegations appear:

2. At the time of the last hearing, attorney for the petitioner conceded, to the extent that the testimony did not establish that the respondents exercised undue influence or fraudulently induced the decedent to surrender control of her assets to the respondents, no relief could be granted by the court on the grounds of undue influence or fraud despite the allegations in the complaint.

3. Petitioner relied on the testimony offered to establish that the decedent surrendered control of her assets to the respondents during her life with the express understanding that respondents would act as trustees of the decedent's funds protecting them for her use during her life and for the use of her only living son and heir, the petitioner herein, after her death.

The record clearly reflects that although initially appellee attempted to establish undue influence or a fraudulently induced transfer of the property, he abandoned that position and relied upon a trust theory.

The Court:

Q. Do you pare your case down to the fact or to the contention at least that you are relying on a trust

relationship, of which you are contending now your client, Sam Trbovich, is the beneficiary?

A. Yes.

Q. Is that your sole position?

A. The testimony as presented, pared as the Court has referred to it, to its core, would indicate from the evidence produced that is the basis upon which the Court should and can rely.

Appellants have placed great stress upon the fact that counsel for the appellee repeatedly and incorrectly referred to the trust as a "constructive" trust. Since the pleadings and the evidence clearly set forth the elements of an express trust, we do not believe counsel's error misled appellants. The question of an oral trust was clearly before the Chancellor and properly ruled upon by him.

Decree affirmed. Each party to pay own costs.

MANDERINO, J., did not participate in the decision of this case.