**In re ESTATE OF Celina FIELD.**

Superior Court of Pennsylvania.

Argued May 14, 2008.
Filed July 25, 2008.

Ronald J. Mishkin, Stroudsburg, for appellant.

Joseph P. Hanyon, Pocomo Summit, for Estate of Field, appellee.

BEFORE: BOWES, GANTMAN and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 The American Cancer Society (ACS) appeals the July 12, 2007, Decree ordering the distribution of assets in the Celina Field Living Trust in accordance with a trust amendment, the validity of which constitutes the genesis of this controversy.

¶ 2 On October 5, 2002, decedent Celina Field met with her attorney, Peter J. Gilbert, for purposes of executing a revocable living trust. *See* Record, No. 53, Request for Admission, at Attachment–The Living Trust. The trust named John Kolp a beneficiary in the amount of $100,000 and named both the Cornell University Feline Research Laboratory and appellant ACS as equal beneficiaries of the trust residue. The trust designated the decedent herself as the trustee. During the meeting, Gilbert suggested to decedent, who had long suffered debilitating pain from a pre-existing injury, that she may want to consider altering the trust distribution to include gifts to various pain research foundations.

¶ 3 Decedent considered Gilbert's suggestion and on October 29, 2002, met with Gilbert a second time. N.T., 5/31/07, at 100. At the meeting, Gilbert provided decedent with a red binder containing various completed estate planning documents, including the executed living trust agreement, which Gilbert had retained for notarization after his initial meeting with decedent. *Id.* at 101–102. At the October meeting, decedent and Gilbert discussed various ways to amend the distribution trust contemplated by the living trust. *Id.* at 103.

¶ 4 Gilbert testified that on the following day, October 30, 2002, he drafted partial revisions to the trust. N.T. at 104. Gilbert testified these changes included reducing the amount to be gifted to John Kolp from $100,000 to $75,000; naming decedent's ex-husband Wael Hafez a beneficiary in the amount of $75,000 and granting Hafez a life estate in decedent's residence; naming various cousins *per stirpes* beneficiaries of a $100,000 gift; naming various unidentified pain research foundations the beneficiaries of three quarters of the trust residue; naming the Physicians' Committee for Responsible Medicine the beneficiary of one-eighth of the trust residue; and, finally, diminishing the gift to the Cornell University Feline Research Laboratory to one-eighth of the trust residue. *Id.* at 107; *see also* Record, No. 48, Joint Pretrial Memorandum, at Exb. J. Gilbert testified he never completed the drafted revisions and, therefore, never sent them to decedent. *Id.* at 113.

¶ 5 At some point between October 30, 2002, and January 29, 2003, Gilbert drafted a second set of trust revisions, which eventually came to be known as the Wagner Amendments. The Wagner Amendments include a distribution of $50,000 to Kolp; a distribution of $50,000 and the decedent's home to her cousin Eva Field–Colon; and a distribution of $100,000 to be shared equally amongst decedent's surviving cousins. Record, No. 48, Joint Pretrial Memorandum, at Exb. A. More importantly for our purposes, the Wagner Amendments named four identified pain research foundations, the American Pain Foundation, the National Pain Foundation, the City of Hope National Medical Center, and the National Foundation for the Treatment of Pain, as beneficiaries of three-quarters of the trust residue; the Physicians' Committee for Responsible Medicine a one-eighth beneficiary of the trust residue; and the Cornell University Feline Research Labo-

ratory as a one-eighth beneficiary of the trust residue. *Id.* The Wagner Amendments did not designate ACS as a beneficiary of the Celina Field Living Trust. According to Attorney Gilbert, the amendments were sent to decedent in January 2003; the documents were three-hole-punched so that they could be inserted into the red binder. *See* Trial Court Opinion, Cheslock, J., 7/12/07, at 3; N.T. at 115–116.

¶ 6 In the spring of 2003, Gilbert prepared a third set of drafted revisions to the trust. N.T. at 116–117. He recalled preparing the revisions and due to difficulty in meeting with decedent, he recalled sending her the amendments in the form of replacement pages. He did not have any written documentation of this transaction. *Id.* Those draft revisions included a distribution of $75,000 to Kolp; a distribution of decedent's residence to Field–Colon; and a distribution of $50,000 to Hafez. *See* Record, No. 48, Joint Pretrial Memorandum, at Exb. K. The distribution of the trust residue contemplated by the spring 2003 draft revisions, however, remained identical to the distribution of the trust residue contemplated by the Wagner Amendments. *See id.*

¶ 7 On October 17, 2003, Hafez, decedent's ex-husband, contacted Pocono Township Police. Hafez told police he was concerned about decedent because he had not heard from her in days. Upon investigation, police found decedent's residence locked and no indication someone was inside the residence. Two days later, Pocono Township Police received a call from one of decedent's friends, who expressed reservations similar to Hafez's. After receiving this call, Detective Wagner was dispatched to decedent's residence to investigate. On arrival, again finding the residence locked, Detective Wagner removed an air conditioning unit from a window and climbed through to gain access to the residence. Once inside, and immediately being confronted with a fetid odor, Detective Wagner searched the residence room by room, finding nothing until he got to decedent's bathroom which was locked. Detective Wagner forced entry into the bathroom and found decedent had taken her own life. Decedent left handwritten notes behind stating she was no longer able to live with her physical pain. Record, No. 48, Joint Pre–Trial Memorandum, at Exb. B.

¶ 8 Detective Wagner immediately called the State Police Forensic Team to secure the scene. While assisting in securing the scene, Detective Wagner found a red binder left conspicuously on the kitchen table; he subsequently logged the binder into evidence at the police station. N.T. at 9–10. At some point, Detective Wagner removed the various documents contained in and with the binder, photocopied them, organized the copies into two packets, and then attempted to replace the originals in the red binder. *Id.* at 10–13. The first copied packet contained the original, executed living trust; the second contained the Wagner Amendments. *Id.* at 12. Detective Wagner testified he could not recall whether the various documents he photocopied were arranged loosely in the red binder or whether they were actually placed through the three-hole rings. *Id.* at 23–24. He did, however, unequivocally testify that he pulled the Wagner Amendments "out" of the red binder. *Id.* Detective Wagner further testified that he did not find any other estate planning documents in decedent's residence. *Id.* at 21.

¶ 9 On October 8, 2004, Eva Field–Colon commenced the underlying litigation by filing a petition requesting, *inter alia,* a declaratory judgment stating that the Wagner Amendments were valid and controlled the distribution of decedent's trust assets. The Commonwealth, as *parens patriae,*

filed an answer with new matter to Field–Colon's petition on December 3, 2004. Three days later, estate executor and successor trustee Kolp, represented in his individual capacity by Gilbert, filed his own answer and conceded that the Wagner Amendments were valid. Record, No. 12, at ¶¶ 9, 11.

¶ 10 On September 30, 2005, Gilbert filed a first intermediate accounting of the decedent's estate on both his own behalf as counsel for the estate and on Kolp's behalf, in the latter's capacity as successor trustee.[1] The Commonwealth filed objections to the accounting on December 1, 2005. On June 13, 2006, ACS filed an answer to Field–Colon's still pending petition. Thereafter, Gilbert filed a petition asking the orphans' court to allow him to complete the accounting of decedent's estate and to permit final distribution, and on December 28, 2006, ACS filed an answer objecting to Gilbert's petition. Approximately a month later, on January 29, 2007, the Commonwealth filed its own answer, which also objected to Gilbert's petition.

¶ 11 On April 17, 2007, Colon–Fields withdrew her petition. The only outstanding issue, therefore, was whether Gilbert's proposed distribution of the decedent's estate and trust assets, which was predicated on the wishes memorialized in the Wagner Amendments, was proper. *See e.g.*, Record, No. 44, Amended Trustee's Statement of Distribution.

¶ 12 A hearing was held on May 31, 2007, and the orphans' court, after considering the testimony of both Attorney Gilbert and Detective Wagner among others, concluded the Wagner Amendments were valid. In doing so, the court noted that the living trust, first executed in October

of 2002, allowed for amendment in accordance with the following provision:

#### d. Amend or Revoke the Trust

I shall have the absolute right to amend or revoke my trust, in whole or in part, at any time. *Any amendment or revocation must be delivered to my Trustee in writing.*

This right to amend or revoke my trust is personal to me, and may not be exercised by any legal representative or agent acting on my behalf.

*See* Record, No. 53, Request for Admission, at Attachment–The Living Trust, at Art. 4, § 1d (emphasis added). The orphans' court, noting that decedent had named herself as trustee, concluded:

[T]he factual situation in this case indicates that the Decedent/Trustee delivered the [Wagner] amendment to herself by placing it in or about the red binder in a conspicuous manner thereby amending the trust. In this manner, the Wagner Amendment completed sometime between October 30, 2002 and January 29, 2003 controlled the Trust document at the time of the Decedent's demise. Although there were other amendments to the Trust, the amendment dated October 30, 2002, and the Spring amendment in 2003, there was no indication that these amendments were delivered and/or accepted by the Trustee.... A compelling reason to support our findings is that the Wagner Amendment was properly lodged in the red binder containing the Trust. We believe that the placement of the amendment with the

---

1. To clarify, the record indicates Attorney Gilbert was representing executor and successor trustee Kolp both in his capacity as executor/trustee and as an individual. *See* Record, No. 12, Kolp's Answer; *see also* Record, No. 17–18, First Intermediate Accounting of John Kolp, Executor and Trustee. On February 13, 2007, Gilbert *withdrew the appearance he* previously had entered on Kolp's behalf. Record, No. 38.

Trust constituted an effective method of amendment as provided for in the Trust. Trial Court Opinion, at 6–7.

¶ 13 ACS filed a timely notice of appeal. On August 3, 2007, appellees American Pain Foundation and National Pain Foundation, both residual beneficiaries under the Wagner Amendments, petitioned the orphans' court for a finding that the July 12, 2007, Decree was final. *See generally,* Pa.R.A.P. 342(1), **Orphans' Court Orders Appealable. Orders Determining Realty, Personalty and Status of Individuals or Entities. Orders Making Distribution.** That same day, the court issued a Rule 1925(b) Order with which the ACS complied in a timely fashion and on August 8, 2007, the orphans' court certified the underlying Decree as final. ACS raises a single issue for our review:

> Whether an amendment to an *inter vivos* trust was valid when the provisions of the trust require amendments to be in writing and reserve the authority to amend exclusively to the Settlor, and when the purported amendment was not signed, initialed or otherwise adopted by the Settlor as "her" intended amendment?

Appellant's brief at 5.

¶ 14 The standard and scope of our review is well-defined:

> The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal

error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence. However, we are not limited when we review the legal conclusions that Orphans' Court has derived from those facts.

*In re Estate of Cherwinski,* 856 A.2d 165, 167 (Pa.Super.2004), quoting *In re Estate of Schultheis,* 747 A.2d 918, 922 (Pa.Super.2000), appeal denied 563 Pa. 703, 761 A.2d 551 (2000).

¶ 15 The governing substantive rules of law which guide our inquiry are also well-defined. A settlor may only amend a trust pursuant to the express terms of the trust agreement. *In re Estate of Dotterrer,* 397 Pa.Super. 103, 579 A.2d 952, 953 (1990), *appeal denied* 527 Pa. 611, 590 A.2d 297 (1991), *cross-appeal denied* 527 Pa. 610, 590 A.2d 297 (1991), *citing In re Trust of Kaufmann,* 460 Pa. 24, 331 A.2d 209, 211 (1975) ("[A] revocable or amendable trust can only be revoked or amended in accordance with the terms of the trust."); *see also Scalfaro v. Rudloff,* 594 Pa. 210, 934 A.2d 1254 (2007). A settlor's intent with respect to the power of amendment must be determined from the language contained within the four corners of the trust instrument, the scheme of distribution contemplated therein, and the circumstances surrounding the execution of the trust instrument. *Estate of Taylor,* 361 Pa.Super. 395, 522 A.2d 641, 643 (1987). This Court will only apply the principles of trust construction when the settlor's intent cannot be determined with reasonable certainty from the language of the trust instrument itself. The settlor's intent to execute a proposed amendment cannot be offered into evidence for purposes of superseding the unambiguous requirements of a given trust agreement.

*In re Steinsapir,* 392 Pa.Super. 355, 572 A.2d 1270, 1273 (1990), *appeal denied* 527 Pa. 602, 589 A.2d 693 (1991).

¶ 16 ACS initially contends "the Pennsylvania Supreme Court has recognized that the principles applicable to the construction of trust instruments are essentially the same as those used in the construction of wills." Appellant's brief at 16. ACS points out that wills must be signed by the testator in order to have effect in the Commonwealth. *Id., citing* 20 Pa. C.S.A. § 2502, **Form and execution of a will.** By analogy ACS contends a trust, such as the Celina Field Living Trust, which allows alteration by a "writing to amend" can only be amended when the amendatory writing, if prepared by a third-party, is "ratified or adopted by the Settlor in some fashion." Appellant's brief at 17. ACS concludes that since the decedent did not ratify or adopt the Wagner Amendments "by signature, initials, mark or otherwise," these amendments are invalid. *Id.*

 ¶ 17 ACS' attempt to analogize the law of wills with the law of trusts by resorting to general pronouncements is unpersuasive. ACS is correct in its assertion that a will is only valid when signed, marked, or signed by a third-party at the direction of the testator. 20 Pa.C.S.A. § 2502, *supra.* The issue of whether a will has been executed validly, nevertheless, has no bearing on the issue of whether a trust amendment is valid. There is *no* support in our caselaw for the proposition that a trust amendment must be signed by the settlor simply because "the right to amend ... is personal to the Settlor." Appellant's brief at 16. To the contrary, in 2002 and 2003, when decedent settled her living trust and when the various

amendments thereto were drafted, personalty trust agreements themselves did not have to be written and signed, or otherwise executed, to be effective. *Dotterrer, supra* at 954, *citing In re Estate of Trbovich,* 488 Pa. 583, 413 A.2d 379 (1980); *cf.* 20 Pa.C.S.A. § 7732, **Requirements for creation.** More to the point, the law governing how revocable trusts can be amended has been consistent throughout this Commonwealth's history, and nothing in this history requires a trust amendment to be executed before it is deemed valid. *Kaufmann, supra* at 211 ("[A] revocable or amendable trust can only be revoked or amended in accordance with the terms of the trust.").[2]

¶ 18 On July 7, 2006, this Commonwealth adopted the Uniform Trust Act (UTA). 2006 Pa. ALS 98. Title 20, section 7752, **Revocation or amendment of revocable trust, (c) How to revoke or amend,** of the UTA provides:

The settlor may revoke or amend a revocable trust only:

(1) by substantial compliance with a method provided in the trust instrument; or

(2) if the trust instrument does not provide a method or the method provided in the trust instrument is not expressly made exclusive, by a later writing, other than a will or codicil, that is signed by the settlor and expressly refers to the trust or specifically conveys property that would otherwise have passed according to the trust instrument.

*Id.*

¶ 19 Section 7752(c)(1) allows a settlor to revoke or amend a revocable trust by substantially complying with a method out-

---

2. *See also e.g., In re Estate of Devine,* 910 A.2d 699, 703 (Pa.Super.2006), *appeal denied* 592 Pa. 767, 923 A.2d 1174 (2007) (concluding a settlor effectively revoked a trust by granting

herself, as trustee, and her successor trustees the authority to alienate the real property *corpus* free and clear of the trust and then exercising this authority).

lined in the trust instrument. The statute says nothing about the "method" being an executed writing; it is only when the trust agreement contains no "method" for amendment that an executed writing is required to amend.

¶ 20 The Celina Field Living Trust allowed for amendment by delivering it to the trustee in writing. Record, No. 53, Request for Admission, at Attachment–The Living Trust, at Art. 4, § 1d. The trust agreement says nothing about execution, signature, mark, or other method of affirmation aside from delivery; the language of the trust agreement is unambiguous and ACS does not contend otherwise. We may not engraft a requirement for amendment into the trust agreement the settlor herself did not see fit to impose. *See and cf. Steinsapir, supra* at 1273 ("[I]t is axiomatic that a trust agreement may be modified only by *strict* adherence to its express provisions."), *citing Kaufmann, supra* (emphasis in original).

¶ 21 ACS next takes issue with the orphans' court's factual findings and the evidence upon which it relied in rendering these findings. ACS first asserts the court erred in finding the Wagner Amendments were properly lodged in the red binder. Appellant's brief at 17. The court's finding in this regard was predicated on its decision to credit the testimony of Detective Wagner, who discovered the binder and logged it into evidence. Trial Court Opinion at 5; *see also* N.T. at 22–24. Detective Wagner testified unequivocally that he discovered the trust agreement in the red binder lying on the decedent's kitchen table. *Id.* There is nothing in the certified record which would lead us to challenge Detective Wagner's veracity. Our standard of review does not allow us to disturb the orphans' court's credibility determinations without a provocative reason for doing so.

¶ 22 ACS next asserts the orphans' court erred in considering extrinsic evidence of the various draft revisions, discussed in detail in the factual narrative of this case, as evidence that the decedent intended the Wagner Amendments to be valid. The court addressed the issue as follows: "Upon consideration of the evidence presented at hearing, we believe the three amendments to the Trust clearly indicate that the Decedent did not intend to make ACS a beneficiary of her Trust." Trial Court Opinion at 7.

¶ 23 The rule of law with respect to the use of extrinsic evidence in interpreting trust agreements was recently stated by our Supreme Court as follows: "A trust instrument that is unambiguous on a matter may not be superseded by extrinsic evidence of the settlor's intent." *Scalfaro, supra* at 1257, *citing Kaufmann, supra* at 212. It is clear the orphans' court did not use evidence of the draft trust revisions to "supersede" the unambiguous language of the trust agreement. Rather, it relied on the draft revisions as support for its conclusion that the trust agreement was unambiguous and that the decedent had carried out the method for amendment provided by the agreement.

¶ 24 ACS next asserts that if the decedent wanted to ratify the Wagner Amendments, she had the opportunity to do so at the January 29, 2003, meeting with Attorney Gilbert and her failure to do so is dispositive evidence that she never intended to adopt the amendments. Again, we disagree. The trust agreement provided an unambiguous and lawful method of amendment and the orphans' court concluded decedent used this method to amend her trust. We cannot upset this finding on the basis of extrinsic evidence of what the decedent decided not to do.

¶ 25 ACS then asserts: "To argue that the Settlor did not have to execute the

written amendment would permit any person at any time to simply substitute new pages into the trust document, thereby replacing the original trust provisions and claim they received instructions from the Settlor to do so." Appellant's brief at 18–19. While fraud is unquestionably a relevant concern in the context of trusts, there is no evidence in this case which tends to indicate the decedent was induced, manipulated, or unduly influenced into amending her trust. Indeed, there is no evidence the pain research foundations, which were substituted for the ACS as beneficiaries, had any knowledge they were beneficiaries of the trust.

¶ 26 ACS' third primary contention is a veiled restatement of its first. ACS contends the court should have required appellees to produce clear and convincing evidence that the Wagner Amendments are valid. Appellant's brief at 21, *citing In re Estate of Cornell*, 511 Pa. 475, 515 A.2d 555 (1986). ACS further contends the "evidence adduced by the Appellees did not raise to meet clear and convincing evidence of Settlor's intent." Appellant's brief at 22.

¶ 27 ACS' reliance on *Cornell, supra* is misplaced. In *Cornell*, a savings and loan association redeemed a certificate of deposit owned by a decedent for the executor of the decedent's estate. *Id.* at 556. After the certificate was redeemed, the executor continued to receive interest payments made out to the decedent. Perplexed, the executor contacted the association. The association informed the executor that a second certificate of deposit was on the decedent's account and then allowed the executor to redeem the certificate. Approximately five months later, the association contacted the executor and informed him the second certificate had been redeemed in error because it inadvertently had been issued to replace the first. The association brought claims against the es-

tate for conversion and trespass. In analyzing whether this Court had erred in reversing the orphans' court's conclusion that the association was unable to carry its burden of proof in establishing its claim, our Supreme Court noted: "Having chosen to bring the claim against the decedent's estate in the Orphans' Court, it was the Appellee's burden to establish and prove that claim by evidence which is clear, direct, precise and convincing." *Cornell, supra* at 556, *citing Estate of Allen*, 488 Pa. 415, 412 A.2d 833 (1980).

¶ 28 *Cornell* provides neither factual nor legal guidance in this matter in that it involved a claim against a decedent's estate by a creditor. Moreover, we are unaware of any case in this Commonwealth which sets forth the proposition that the validity of a trust amendment must be proven by "evidence which is clear, direct, precise and convincing." *Cornell, supra* at 556 (citation omitted). In short, ACS does not point to any evidence of record which would justify this Court's application of a heightened burden of proof.

¶ 29 Finally, ACS asserts that any evidence, either oral or written, introduced concerning the various draft trust revisions and the Wagner Amendments was inadmissible parol evidence. This contention suffers from a number of irreparable flaws.

¶ 30 First, we are unaware of a case which applies the parol evidence rule, created for and applied in contractual disputes, to disputes over the validity of trust amendments. *See generally, Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 854 A.2d 425, 436–437 (2004). Secondly, the parol evidence rule is narrow in that it only prohibits a party from offering oral evidence of *"preliminary* negotiations, conversations and verbal agreements" which purport to add or subtract to a written, unambiguous, and integrated agreement. *Id.* at 436. Trust amend-

ments are, by their very nature, drafted after the underlying trust agreement is executed or otherwise formed. Moreover, it is clear from the substance of ACS' argument that it is confusing the parol evidence rule with the rule that extrinsic evidence cannot be used to supersede the clear intent of a settlor as embodied in the unambiguous language of a trust agreement. *See e.g.,* appellant's brief at 23 ("Moreover, the Supreme Court recognized that additional evidence of the Settlor's intention to effectuate the proposed amendment cannot be introduced to explain or supersede the unambiguous requirements of the Trust Agreement.") (citations omitted).

¶ 31 Our case law is clear. A revocable trust settled prior to December of 2006 can be amended only in accordance with the express terms of the underlying trust agreement. The Celina Field Living Trust allowed for amendment in writing when a drafted revision was delivered to the trustee, decedent herself; no one disputes the Wagner Amendments were in writing. Further, Attorney Gilbert testified that the photocopy of the Amendments provided by Detective Wagner showed the original was "three-hole punched," meaning it was ready for placement in decedent's red binder. N.T., 5/31/2007, at 116. Detective Wagner testified he pulled the Amendments out of the red binder when he first discovered it. *Id.* at 23–24. Extrinsic evidence of the decedent's physical health, other draft revisions to the trust, and of decedent's conversations with Gilbert only serve to supplement the evidence of decedent's intent, which is embodied in the unambiguous language of the trust agreement.

¶ 32 The method of amendment decedent reserved to herself was lawful and, for purposes of this case, effective. While we are cognizant of ACS' concerns with the larger picture, there is nothing in this case which would tend to indicate the Wagner Amendments are the by-product of questionable activity or undue influence. As ACS has failed to establish reversible error, we affirm.

¶ 33 Decree affirmed.